ELIAS W. VAN VOORHIS et al., Executors, etc., Appellants, *v.* SARAH A. BRINTNALL et al., Appellants, ELLA THIERS, et al., Respondents.

The validity of a marriage contract is to be determined by the law of the State where it was entered into; if valid there it is to be recognized as such in the courts of this State, unless contrary to the prohibitions of natural law, or the express prohibitions of a statute.

While every State can regulate the *status* of its own citizens, in the absence of express words, a legislative intent to contravene the *jus gentium* under which the question of the validity of a marriage contract is referred to the *lex loci contractus* cannot be inferred; the intent must find clear and unmistakable expression.

Where, therefore, by a judgment of the Supreme Court of this State, the marriage between E. and B. was dissolved on the ground of the adultery of the latter, the decree of divorce adjudging it to be unlawful for him to remarry during the life of E., and, thereafter, during her life, he went to Connecticut and there married I., both being residents of this State, having gone out of it for the purpose of evading its laws, returning to it on the day of the marriage, and thereafter, residing here, which marriage was valid under the laws of Connecticut, *held*, that a child of the second marriage, born in this State, was legitimate and entitled to share with the children of the first marriage in a devise to the issue of B.; also that the provision of the Revised Statutes (2 R. S. 139, § 5; id. 146, § 49), prohibiting the second marriage of a person divorced on the ground of his or her adultery, during the life of the former husband or wife, and declaring such second marriage void, had no application as they are in the nature of a penalty, and have no effect outside of the State, in the absence of express terms showing a legislative intent to give them that effect.

*Cropsey* v. *Ogden* (11 N. Y. 228), *Haviland* v. *Halstead* (34 id. 643), distinguished and limited.

*Marshall* v. *Marshall* (2 Hun, 238), *Thorp* v. *Thorp* (23 Alb. L. J. 213), overruled.

*Van Voorhis* v. *Brintnall* (23 Hun, 264), reversed.

(Argued March 18, 1881 ; decided October 4, 1881.)

THESE are appeals by the plaintiffs and certain of the defendants from a judgment of the General Term of the Supreme Court, in the second judicial department, entered upon an order made December 14, 1880, which affirmed a judgment entered upon a decision of the court on trial at Special Term. (Reported below, 23 Hun, 264.)

The nature of the action and the material facts are stated in the opinion.

*George W. Stephens* for plaintiffs, and defendant Sarah A. Brintnall, appellants.   The estate is to be held intact as a unit, and the income of the whole, after being ascertained, is to be divided in the proportions designated. (*Coster* v. *Lorillard*, 14 Wend. 265 ; *Vail* v. *Vail*, 7 Barb. 236.)   While Barker Van Voorhis during his life-time had a vested remainder in the *corpus* of the estate, it was divested by his death before the vesting of the estate. (*Jackson* v. *Littell*, 56 N. Y. 111 ; *Howe* v. *McCormick*, 57 id. 310 ; *Bennett* v. *Garlock*, 10 Hun, 239 ; *Moore* v. *Littell*, 41 N. Y. 66 ; *Chesen* v. *Keith*, 1 Hun, 589 ; *Roome* v. *Phillips*, 24 N. Y. 463 ; *Bockes* v. *Hathorn*, 78 id. 222.)

*D. M. Porter* for R. Van Voorhis, appellant.   The presumption is that the marriage of the appellant's parent in Connecticut was in accordance with the law of the place where celebrated. (*Hutchins* v. *Kimmel*, 31 Mich. 126 ; *Scrimshire* v. *Scrimshire*, 2 Hagg. Cons. 325 ; *Catterall* v. *Sweetman*, 1 Rob. Eccl. 304.)   In the absence of proof as to what was the law of marriage in Connecticut, the court must presume that the common law prevails there. (*Starr* v. *Peck*, 1 Hill, 270 ; *Throop* v. *Hutch*, 3 Abb. Pr. 23 ; *Abell* v. *Douglas*, 4 Den. 305 ; *Holmes* v. *Boughton*, 10 Wend. 75.)   The judgment of

Elizabeth Van Voorhis against Barker Van Voorhis left the latter a single person. (*The People* v. *Hovey,* 5 Barb. 117; *Comm. of Mass.* v. *Putnam,* 1 Pick. 136; *Dickson* v. *Dickson,* 1 Yerg. 110.) The penal laws of a sister State can have no operation or effect beyond her own territorial jurisdiction; they therefore cannot be noticed or enforced in the courts of other States. (*Dickson* v. *Dickson,* 1 Yerg. 110; *Sims* v. *Sims,* 75 N. Y. 466, 470; *Marshall* v. *Marshall,* 2 Hun, 251, 252; *Scoville* v. *Canfield,* 14 Johns. 338; Story on Conflict of Laws, § 620; *Fuller's Adm'r* v. *Fuller,* 40 Ala. 301, 303, 304; *West Cambridge* v. *Lexington,* 1 Pick. 506, 512; *Ponsford* v. *Johnson,* 2 Blatch. 51, 59; *Greenwood* v. *Curtis,* 6 Mass. 358, 378; *Philips* v. *Hunter,* 2 H. Black. 402, 412; *Parton* v. *Hervey,* 1 Gray, 119; *Catteral* v. *Sweetman,* 1 Rob. Eccl. 304; 11 Jur. 914; *Haviland* v. *Halstead,* 34 N. Y. 643; *Putnam* v. *Putnam,* 8 Pick. 433; *Folliot* v. *Ogden,* 1 H. Black. 123, 135; *Hutton* v. *Moore,* 5 Wheat. 69; *Connor* v. *Green,* 17 Mass. 540; *U. S.* v. *Lathrop,* 17 Johns. 4.) Marriage is everywhere regarded as a civil contract, and being valid where it is entered into it is valid everywhere. (*Meister* v. *Moore,* 6 Otto, 76, 78; *Parton* v. *Hervey,* 1 Gray, 119; *Stevenson* v. *Gray,* 17 B. Monr. 193; *Medway* v. *Needham,* 16 Mass. 157, 159; *Greenwood* v. *Curtis,* 6 id. 358; *West Cambridge* v. *Lexington,* 1 Pick. 506, 508; *Putnam* v. *Putnam,* 8 id. 433; *Inhabitants of Massachusetts* v. *Putnam,* 1 id. 136; *Clark* v. *Clark,* 8 Cush. 385; *Sutton* v. *Warren,* 10 Metc. 451; *Ponsford* v. *Johnson,* 2 Blatchf. 61; *Dickson* v. *Dickson,* 1 Yerg. 110; *Scrimshire* v. *Scrimshire,* 2 Hagg. Cons. 395; *Hutchins* v. *Kimmel,* 31 Mich. 126; *Webb's Estate,* 1 Tucker, 372; *Fuller* v. *Fuller,* 40 Ala. 301, 303, 304; *Simonin* v. *Mallac,* 2 Swabey & Tristram, 67; *Birtwhistle* v. *Vardell,* 7 Clark & Finnelly 895, 921; *Ilderton* v. *Ilderton,* 2 H. Black. 141; *Compton* v. *Beircroft,* Buller's Nisi Prius, 113 *b; Herbert* v. *Herbert,* 2 Hagg. Cons. 263, 269; *Swift* v. *Kelly,* 3 Knapp, 257; *Fornshill* v. *Murray,* 1 Bland. Ch. 479; *Wall* v. *Williamson,* 8 Ala. 48; *Dummersley* v. *Fishley,* 3 A. J. Marsh. [Ky.] 368; *Dalrymple* v. *Dalrymple,* 2

Hagg. Cons. 54; *Medway* v. *Needham*, 1 Pick. 157.)   The marriage of this appellant's father and mother in Connecticut being valid in that State is valid everywhere, and this appellant is the legitimate issue of such marriage. (*Stevenson* v. *Gray*, 17 B. Monr. 193; *Hutchins* v. *Kimmel*, 31 Mich. 126, 134; *Ponsford* v. *Johnson*, 2 Blatchf. 51, 59; *Simonin* v. *Mallac*, 2 Swabey & Tristram, 67, 77; *Scrimshire* v. *Scrimshire*, 2 Hagg. Cons. 395; *Herbert* v. *Herbert*, id. 263, 269; *Fornshill* v. *Murray*, 1 Bland. Ch. 479; *Putnam* v. *Putnam*, 8 Pick. 433; *Medway* v. *Needham*, 16 Mass. 157, 158; *Wall* v. *Williamson*, 8 Ala. 48; *Dumersley* v. *Fishley*, 3 A. J. Marsh. [Ky.] 368; *Clark* v. *Clark*, 8 Cush. 385; *Webb's Estate* [Sur.], 1 Tucker, 372; *Ryan* v. *Ryan*, 2 Phill. Eccl. 332; *Lacon* v. *Hykin*, 3 Stark. 178; *Birtwhistle* v. *Vardill*, 7 Clark & F. 895, 921; *Swift* v. *Kelly*, 3 Knapp, 257; Potter's Dwarris on Statutes, 37, 361; *McAdam* v. *Walker*, 1 Dow. 148; *Davis* v. *Davis*, 7 Daly, 308; *Cheever* v. *Wilson*, 9 Wall. 108; *Hunt* v. *Hunt*, 72 N. Y. 217; *Kinnier* v. *Kinnier*, 45 id. 335.)   The second wife has dower in the lands of which her husband was seized during her coverture, after taking out the lands assigned for dower to the first wife, and in all the lands, acquired after the divorce, of which he is seized at the time of his death.   (1 Washburne on Real Property, 209.)

*Richard Busteed, Jr.*, for respondents.   Upon the death of Barker Van Voorhis his children became possessed of a vested remainder in the one-third of decedent's estate, and in consequence are entitled to take as purchasers.   (2 R. S. 1101, § 13 [6th ed.].)   The legacy to Barker Van Voorhis did not lapse on account of his dying before the happening of the event which would have entitled him to possession, but by the terms of the will as well as in strict conformity to the laws of the land, it descended to his heirs, the respondents.   (2 R. S. 1103, § 34 [6th ed.].)   A former wife is not entitled to dower in land, the title to which was acquired by the former husband subsequent to a judgment in favor of the wife in an action for divorce on the ground of adultery of the husband. (48

How. Pr. 382.) *A fortiori* she is entitled to dower in lands, the title to which is acquired during coverture. (1 R. S. 740, § 1; 3 R. S. 31, § 1 [5th ed.].) This right of dower once acquired cannot be defeated, except by the misconduct of the wife herself, or her death before that of her husband. (2 R. S. 1122, § 16 [6th ed.]; *Wait* v. *Wait*, 4 N. Y. 95; 6 Duer, 153.) Each State has the right to determine the status of its own citizens; the domicile decides which State has the right. (10 How. [U. S.] 92; Story on Conflict of Laws, 141, § 106.) Penal disabilities, such as the usual prohibitory clause in judgments of divorce *a vinculo*, in this State, although local, cannot follow the person if he becomes a *bona fide* citizen of another State, yet they are not removed by a mere temporary absence, or without an expressed intention. (*Kinnier* v. *Kinnier*, 45 N. Y. 535; 10 How. [U. S.] 92; 14 id. 251; Story on Conflict of Laws, 141, § 106; 2 Parsons on Contracts, 599.) The property left by Barker Van Voorhis upon his dying intestate being real estate situated in the State of New York, cannot be inherited by a child who, by the laws of that State, is illegitimate. (2 R. S. 1135, § 19 [6th ed.]; *Birtwhistle* v. *Vardell*, 2 Clark & F. 511; 7 id. 895.) The alleged marriage of Barker Van Voorhis was a nullity here, and the issue of such a marriage is illegitimate in the State of New York, and cannot inherit property situated therein. (*Marshall* v. *Marshall*, 2 Hun, 238; *Birtwhistle* v. *Vardill*, 2 Clark & F. 511; 7 id. 895.)

DANFORTH, J. By this action the plaintiffs seek a construction of the will of Elias W. Van Voorhis deceased, and an adjudication as to the right under it of the defendant, Rose Van Voorhis. The questions turn upon these facts: The testator died in 1869, leaving a widow and three children, Elias, Sarah and Barker. The widow and Elias were appointed executors. By the will a specific devise was made to his wife, and the residue of the estate given to the executors in trust, "so long as his wife should live," for the accumulation of income and payment by them as therein directed. By its *second* clause two-

ninths part of this income was to be paid for the benefit of
Barker, as follows : Four hundred dollars annually for the
support of Ella Van Voorhis, and the same amount for the
support of Elias William Van Voorhis, children of Barker, un-
til they should respectively reach the age of twenty-one years,
the remainder of said two-ninths to Barker. Before the com-
mencement of this action Ella reached the age of twenty-one
years. The *sixth* clause of the will provided that upon the
death of the testator's wife all his property should be divided
equally between his children above-named, share and share alike,
and the issue of any deceased child should take the share his, her
or their parent would have taken if then living. Elizabeth was
then the wife of Barker and mother of Ella and Elias, his
children. Afterward, and on the 19th of April, 1872, in con-
sequence of proceedings begun by her, the Supreme Court of
this State dissolved the marriage of Elizabeth and Barker, on
the ground of his adultery, and also adjudged that it should
not be lawful for him to marry again until her death. That
event has not happened, but on the 10th of June, 1874, he
married Ida L. Baron Schroeder at the city of New Haven, in
the State of Connecticut. Both parties then resided in this
State, and the trial court found as a fact " that they went to
New Haven for the purpose of evading the New York law,
for the reason that the said Barker Van Voorhis was prohibited
from marrying again in this State." On the same day they re-
turned to New York and continued to reside there until the
death of Barker in 1880. Defendant Rose Van Voorhis was
a child of that marriage, born in this State April 2, 1875. The
trial court also found that the marriage was valid under the
laws of Connecticut, but, from the facts above stated, that it
was null and void by the laws of this State./ Rose, therefore,
was adjudged illegitimate and not entitled to take under the
will. / It was also declared that the two-ninths of the income
appropriated for the benefit of Barker (after deducting $400
annually during the minority of Elias) were undisposed of and
went by force of the statute of distributions to Elizabeth, his
former wife, and her children. The plaintiffs, and Rose Van

Voorhis and Sarah Brintnall, defendants, appealed to the General Term of the Supreme Court, where the judgment was affirmed. They now appeal to this court.

The plaintiffs and the defendant Sarah Brintnall object to so much of the judgment as disposes of the income set apart by the second clause of the will. They insist that Elizabeth, the former wife of Barker, has no concern with it. On the contrary, they say it should go to the testator's son Elias, and Sarah, his daughter, each taking one-third, and the remaining third to the children of Barker. This question was not presented by the complaint as one concerning which the executors had any doubt, and they now claim that it was by inadvertence passed upon by the trial court. It would seem, therefore, that the attention of that court should have been called to it in some other way than by exception and appeal. As the case stands there is such a defect of parties as would make unavailing our decision if it should accord with the plaintiffs' views. Elizabeth, the mother, is not before us and would yet have a right to be heard. Whether one released without fault on her part from the obligations of marriage may, upon the death of her former husband, have a share of his personal estate, and if so, whether it is to be measured by its condition at the time of the divorce or at his death, should not be determined in her absence. Our conclusion, however, upon the remaining question will lead to a new trial; and in the meantime such steps can be taken as the parties think fit to complete the record.

That question involves the civil *status* acquired by Barker Van Voorhis and Ida by the marriage in Connecticut. *First,* it is a general rule of law that a contract entered into in another State or country, if valid according to the law of that place, is valid everywhere (*The King of Spain* v. *Machado,* 4 Russ. 225; *Potter* v. *Brown,* 5 East, 130; Story's Conflict of Laws, § 242); and this, says Kent (2 Com. 454), "is *jure gentium,* and by tacit assent," and Lord BROUGHAM in *Warrender* v. *Warrender* (2 Cl. & Fin. 529, 530), declares that the courts of the country where the question arises, resort to the law of the country where the contract was made, not *ex comitati,* but

*ex debito justitiæ.* And coming to the case in hand, the rule recognizes as valid a marriage considered valid in the place where celebrated. (Story's Conflict of Laws, §§ 69, 79 ; *Connelly* v. *Connelly*, 2 Eng. L. & Eq. 570.) " We all know," say the court in that case, " that in questions of marriage contract, the *lex loci contractus* is that which is to determine the *status* of the parties," and also declare that this by consent of all nations is *jus gentium.* In *Dalrymple* v. *Dalrymple* (2 Hagg. Const. 54), it was held that a marriage good in Scotland though otherwise by the law of England, is valid in that country ; and this was put upon the ground that the rights of the parties must be tried by reference to the law of the country where they originated. In *Scrimshire* v. *Scrimshire* (2 Hagg. Const. 395), the same principle is stated in different words. The court say, " All parties contracting gain a forum in the place where the contract is entered into." (*Warrender* v. *Warrender, supra ; Lacon* v. *Higgins,* 1 Dow. & Ry. 38 ; *Butler* v. *Freeman,* 1 Amb. 303.) Not only is this the result of English decisions, but is believed to state the principle upon which the courts of many of our sister States have acted (*Greenwood* v. *Curtis,* 6 Mass. 358 ; *Medway* v. *Needham,* 16 id. 157 ; *Parton* v. *Hervey,* 1 Gray, 119 ; *Putnam* v. *Putnam,* 8 Pick. 433 ; *Dickson* v. *Dickson* 1 Yerg. 110 ; *Stevenson* v. *Gray,* 17 B. Monr. 193 ; *Fornshill* v. *Murray,* 1 Bland. Ch. 479) ; and by which our own, with few exceptions, have been governed. In *Decouche* v. *Savetier* (3 Johns. Ch. 210), Chancellor KENT says : " There is no doubt of the general principle that the rights dependent upon nuptial contracts are to be determined by the *lex loci.*" In *Cropsey* v. *Ogden* (11 N. Y. 228), JOHNSON, J. says (p. 236 ) : " By the universal practice of civilized nations the permission or prohibition of particular marriages of right belongs to the country where the marriage is to be celebrated." The court had before it the case of one who, having a former wife living, from whom he then had been divorced for adultery by him committed, married a second time in this State. His last marriage was held to be void under our statute prohibiting a second or other subsequent marriage of any person " during the life-time of any former husband or wife of

such person." There the former marriage, his adultery, and the existence of his first wife established the condition or quality of the man. They were facts in his history, and brought him within the terms of our law. The general rule above stated was applied. The *lex loci* governed. But the court said it was not necessary for them to consider what would have been the effect of a marriage celebrated out of this State. Its attention was, however, directly brought to the statute relating to marriages, and the circumstances under which the remarks above quoted, and others seeming to discriminate between a marraige in this State and out of it, were made, render them the more significant. In *Haviland* v. *Halstead* (34 N. Y. 643), a person divorced for the same offense in this State promised in New Jersey to marry the plaintiff. He married another, and an action for the breach of this promise was brought here and failed. The parties resided in this State and contemplated the performance of the contract here. The court carefully distinguish the case so presented from one where a marriage had taken place in a foreign State. They assume that the latter would be treated as valid, although the parties had gone there with intent to evade the laws of this State, and citing *Medway* v. *Needham* (*supra*), say, the doctrine " in favor of marriage so contracted is founded on principles of policy to prevent the great inconvenience and cruelty of bastardizing the issue of such marriages, and to avoid the public mischief which would result from the loose state in which people so situated would live." Indeed the general doctrine is so well settled by the decisions of all courts and the reiteration of text writers as to become a maxim in the law, that one rule in these cases should be followed by all countries; that is, the law of the country where the contract is made. (Story, *supra*, 84 ; 2 Kent's Com. 91–92.) There are no doubt exceptions to this rule ; cases, *first* of incest or polygamy coming within the prohibitions of natural law ( *Wightman* v. *Wightman*, 4 Johns. Ch. 343 ; *Hutchins* v. *Kimmell* (31 Mich. 133 ; Story, *supra*, § 113 *a* [7th ed.] ); *second*, of prohibition by positive law. It is contended by the learned counsel for the respondent that the judgment may be

upheld upon the ground that the marriage is one of the latter class. The assertion, however, is left unsupported by argument or the citation of authorities. Its truth is not so self evident as to dispense with either, and the omission, coupled with our own examination, leads us to think that the courts have not yet spoken with a controlling voice in its favor. It is to be maintained if at all upon the prohibition in the judgment of divorce already referred to and the provisions of the statute which made the judgment proper. (*Graves* v. *Graves*, 2 Paige, 62.) The question is not one of ethics or morality, but the extent of the authority of the statute as a rule of conduct. As a direct inquiry it is here for the first time. There are *dicta* and expressions having relation to it in *Cropsey* v. *Ogden*, and *Haviland* v. *Halstead* (*supra*), tending to confine the effect of the statutory prohibition and declaration of invalidity to second marriages within this State; but in neither case was the precise question before the court for judgment. In other courts of this State it has met with differing answers. In the Supreme Court, first department, *Marshall* v. *Marshall* (2 Hun, 238), by a divided court, and *Thorpe* v. *Thorpe* (Superior Court of New York city), following it, a marriage under similar circumstances was held void. The judgment now before us went upon the principal of *stare decisis*, the court below also following *Marshall* v. *Marshall* (*supra*); *Kerrison* v. *Kerrison*, Special Term, fourth department (8 Abb. N. C. 444), and *Matter of Webb* (1 Tucker, 372 [Surr. Ct.]), are to the contrary. To the latter class may be added *Ponsford* v. *Johnson*, before NELSON and BETTS, JJ. (2 Blatchf. 51). These decisions are irreconcilable, and any determination reached by us must overrule one class or the other. We are therefore at liberty to treat the subject as *res integra*, unaffected by any paramount authority, although greatly assisted by the reasoning of the learned judges who have taken part in those judgments.

The statutory provisions relied upon by the respondent are found in part 2, chap. 8 of the R. S., entitled "Of the domestic relations," and especially in those articles which treat "of husband and wife." (Tit. 1, arts. 1 to 5, vol. 2, p. 138.)

The statute does not define marriage or introduce a new formula for the relation, but treats it as existing, and declares it shall continue "in this State" a civil contract (§ 1, chap. 8, tit. 1, art. 1, part 2), adopts the principles of the common law which renders invalid marriages between persons connected by certain lines of consanguinity (§ 3, id.), or who for want of age or understanding are incapable of consent, or who if capable have been induced to give it by fraud or force. (§ 4, id.) It then declares that no second marriage shall be contracted by any person during the life-time of any former husband or wife of such person, unless the marriage with such former husband or wife shall have been dissolved for some cause other than the adultery of such person, and that every marriage contracted contrary to this provision shall be absolutely void. (§ 5, id.) These circumstances are restated as grounds of divorce, and it is enacted that "whenever a marriage shall be dissolved pursuant to the provisions of this article, the complainant may marry again during the life-time of the defendant, but no defendant convicted of adultery shall marry again until the death of the complainant." (§ 49, id., art. 3.) As originally enacted the same statute (Tit. 1, *supra*, § 2), not only made the consent of parties essential, but limited the class to those "capable in law of contracting," and by its definition excluded males under seventeen and females under fourteen years of age. Although this provision has been repealed, it throws some light upon the legislative intent in devising the system of laws concerning husband and wife. Conditions were annexed not only to the duration, but the creation of this relation, and the frequency with which it might be formed. Certain persons are declared capable, others incapable of forming it, and still others must submit to its dissolution. In one instance, as in the case before us, it cannot be contracted with another while the first co-contractor is living. It is obvious that this last condition is in the nature of a penalty. (*Wait* v. *Wait*, 4 N. Y. 101; *Com.* v. *Lane*, 113 Mass. 471.) It forms no part of the relief sought by the injured party, has no tendency toward compensation, nor is it imposed to that end. It is restraint or

punishment.   (*West Cambridge* v. *Lexington*, 1 Pick. 506–
508; *Clark* v. *Clark*, 8 Cush. 386.)   The fact of adultery is
in the language of the statute an "offense," the person com-
mitting it "a guilty person;" and when established by judg-
ment he is said to be "convicted."   He is, in consequence of
it, deprived of a natural right or privilege which others enjoy.
Moreover for violating this statutory provision he is at least
rendered liable to fine and imprisonment, as for a misdemeanor
(2 R. S., part 4, chap. 1, tit. 6, p. 696, §§ 39, 40); if not for
felony under the provisions of article 2 of the same statute.
(2 R. S. 687.)   The opinion of WALWORTH, Chancellor, went
to that extent in *Graves* v. *Graves* (2 Paige, 62); and
although *People* v. *Hovey* (5 Barb. 121) is to the contrary,
the measure of the offense is not now important, and the last
case holds to the misdemeanor.   To that extent the law is
plain.   The real question is whether such a statute furnishes
an exception to the maxim "*Leges extra territorium non obli-
gant.*"   It is not necessary to assert that the power of the leg-
islature is so limited that no law passed by it would accompany
a citizen into other countries and there control or modify the
legal effect of his actions.   Nor need we deny that it might be
so framed as to affect his person and subject him in this State
to punishment for its violation elsewhere, upon his return to the
jurisdiction of our courts.   On the contrary, it is to be regarded
as settled law that as all persons within its borders, whether citi-
zens or aliens, are liable to be punished for any offense commit-
ted in this State against its laws, its citizens may also be pun-
ished for acts committed beyond its borders where there is a spec-
ial provision of law declaring the act to be an offense, although
committed out of the State.   (Maxwell on Statutes, 119–128;
*Cope* v. *Doherty*, 2 De G. & J. 624; 1 Burge's Col. & For.
Laws 196.)   So, also, may an act committed out of the State
be made to affect an individual, whether citizen or foreigner,
when he comes within its borders and does some other act of
which our laws take notice.   Nor are examples of legislation
effecting these results wanting.   The statute defining acts
which constitute treason (Tit. 1, pt. 4, ch. 1, p. 657, vol. 2 R. S.,

§ 2) illustrates the first: It subjects the offender to punishment, whether the act prohibited is done " in this State or elsewhere." That against dueling is an example of the second: It makes one who by previous engagement fights a duel without the jurisdiction of this State, and in so doing inflicts a wound upon any person, " whereof he shall die within this State," and every second engaged in such duel, guilty of murder within this State. And still more in point, as illustrating its manner of expression where the legislature intends to take cognizance of an act committed outside the limits of the State, or to impress upon the *status* of its citizen a condition of liability for such an act, are the provisions of the statute treating of offenses against " the public peace and public morals." (Tit. 5, pt. 4, ch. 1, art. 1, vol. 2, R. S.) After providing punishments for fighting duels, sending challenges, etc., in the most general terms, excluding no one from its condemnation, but, within the general maxim above quoted, having no extra-territorial force, comes a provision which by its special language attaches to the citizen, goes with him as he crosses the line of his State, and binds him with an obligation in what place soever he is. " If," it says (§ 5, id.), " any inhabitant of this State shall leave the same for the purpose of eluding the operation " of these provisions, and " shall give or receive any such challenge " * * * without this State, he shall be deemed guilty and subject to the like punishment as if the offense had been committed within this State. And we shall see later a provision similar to this, now forming part of the law relating to marriages in the State of Massachusetts. Another instance well shows by contrast the necessity of a declaration that the arm of the law shall be so extended. In proximity to the provisions I have quoted, in the next article (§ 8) is the statute " of unlawful marriages," defining bigamy and declaring its punishment; saying in general terms, "every person having a husband or wife living who shall marry any other person " (with exceptions of no moment here) shall be adjudged guilty of bigamy, providing (§ 10) that " an indictment may be found against any person for a second, third or other marriage herein

prohibited, in the county in which he shall be apprehended, and the same proceedings had thereon 'as if the offense had been committed therein.' " Yet there are no enlarging words affixing themselves to the person of the citizen as in the statute before quoted, or bringing within its purview "a second or other marriage" contracted out of the State. And, therefore, on the trial of one who was indicted for bigamy, the second marriage having taken place in Canada, it was held, as early as 1855, by a court presided over by the late judge W. F. ALLEN, then a justice of the Supreme Court, that this statute had no application, that the second marriage was not an offense against the laws of this State, because they had no "extra-territorial force." (*The People* v. *Mosher*, 2 Par. Cr. Rep. 195.) In like manner, if Barker Van Voorhis had on his return to this State after accomplishing his second marriage, been indicted under the statutes to which I have referred, either for bigamy or for doing a prohibited act, it would necessarily follow that the indictment would fail. Yet the words of the statute are general; in themselves they contain no limitation. But we have been referred to no case, and I think none can be found, where such general words have been interpreted so as to extend the action of a statute beyond the territorial authority of the legislature; and it is only by extending it that our courts can take cognizance of acts there committed. Of the third class, an example is afforded by our statute defining punishment for a second offense (§ 8, p. 699, vol. 2, R. S., pt. 4, ch. 1, tit. 7.) "If any person," it says, convicted of any offense punishable by imprisonment, etc., shall afterward be convicted of any offense, he shall be punished in a mode prescribed. It is evident that these words are general and taken literally would apply to "any person" committing an offense in or out of the State. Applying the mode of construction contended for by the respondent, nothing more would be necessary. But the legislature show that such is not its meaning. By section 10 they declare that "every person who shall have been convicted in any of the United States, or in any district or territory thereof, or in any foreign country, of

an offense which, if committed within this State would," etc., "shall upon conviction of any subsequent offense committed within this State, be subject" to punishment in the same manner and to the same extent "as if the first conviction had taken place in a court of this State." Thus by implication is expressed the opinion of the legislature that the general words of the eighth section, *supra*, would not meet the case provided for in the tenth section. In Massachusetts, after a statute extending the prohibition against a second marriage under circumstances before stated to inhabitants of that State going out of it to evade the law, it was held that if in any event the foreign marriage could be invalidated, it could not be without proof of the intent made necessary by statute. Nor without it could there be a conviction for polygamy. (*Com* v. *Lane*, 113 Mass. 458.) A similar distinction exists under the English law. In 1 Hale's P. C. 662, the case is stated of a woman who married in England and afterward married abroad during her husband's life. It was held she was not indictable under the statute of the former country for bigamy, for the offense was committed out of the kingdom, and the act did not in express terms extend its prohibition to subjects abroad. It is otherwise, however, in regard to certain offenses committed in other countries by Englishmen against their government, viz.: Murder and slave-trading, because the statutes have so provided. (*Warrender* v. *Warrender*, *supra*.) Now if the criminal court has no jurisdiction to punish the act when committed out of the State, how has the civil court jurisdiction to prohibit the doing of the act out of the State? The consequences are the same in either case, and are prescribed by the same statute. Whether a man is punished by fine and imprisonment, or by the disgrace of himself and the woman he married — the bastardy of his children — is a difference in degree only. The severer punishment is in the last alternative. Can the court imply the power to inflict it? Can it exist unless given by express language? I think not.

The statute does not in terms prohibit a second marriage in another State, and it should not be extended by construction. The

mode of construction contended for by the respondent, if applied to the statutes of treason and dueling and the punishment of second offenses, would make useless those provisions which relate to the conduct of a citizen out of the State and the commission of crime in this State by one convicted in another State. Can they be disregarded, or the legislature charged with useless enactments? On the contrary, we must give weight and meaning to them; to their presence in those laws and their absence in the one of marriages. The difference is essential, and the varying language cannot be disregarded. There is first a prohibition broad as in the act before us, wide enough to take in all persons within the State, and prohibiting certain acts — a personal prohibition. Not content with that, the statutes go further and extend the same consequences to those acts when committed out of the State. These provisions are lacking in the law before us. When, therefore, we consider the legislation of this State before referred to, and the general rules regulating the territorial force of statutes, we cannot but regard the omission to provide by law for cases like the present as intentional, but if not, in the language of Lord ELLENBOROUGH, in *Rex* v. *Skone* (6 East, 518), "we can only say of the legislature *quod voluit non dixit.*" This view is sustained by the course of decision and legislation in Massachusetts. In *Medway* v. *Needham* (*supra*), the plaintiff sued for the support of certain paupers — one Coffee and his wife — alleged to have their legal settlement with the defendant. The only question on the trial, or the subsequent hearing before the whole court, respected the validity of his marriage. He was a mulatto and his supposed wife a white woman. They were inhabitants and residents of Massachusetts at the time of their marriage, and the statement is that "as the laws of the province at that time prohibited all such marriages, they went into the neighboring province of Rhode Island and were there married according to the laws of that province," and returned immediately to their home. Both courts held the marriage good. The statute regulating marriages in Massachusetts was at that time like our own, but the court placed their decision upon the

general principle that a marriage good according to the laws of
the country where it is entered into shall be valid in any other
country, PARKER, Ch. J., saying : " This principle is consid-
ered so essential that even where it appears that the parties
went into another State to evade the law of their own country,
the marriage in the foreign State shall be valid in the country
where the parties live ; " and, referring to the statute which
declares second marriages absolutely void, says : " They are
only void if contracted within this State." *West Cambridge*
v. *Lexington* (1 Pick. 506) involved the rights of infant chil-
dren of Samuel Bemis, paupers, to public support in that
State. The question turned upon the validity of his second
marriage ; the first had been dissolved for his adultery. After-
ward and while his former wife was living, he married in New
Hampshire, and the children were from that union. The court
held that if the marriage had been contracted in Massachusetts,
it would be unlawful and void, but that the laws of no country
have force outside of its own jurisdiction, and therefore one,
who by reason of his offense against it is disabled from con-
tracting another marriage, may lawfully marry again in a State
where no such disability is attached to the offense ; and fur-
ther, having a right to marry there, he could not while there
violate the statutes of Massachusetts against polygamy. It
was therefore held that the children were legitimate, their set-
tlement to be where that of their father was, and the town en-
titled to recover for their support. The circumstances of *Put-
nam* v. *Putnam* (8 Pick. 433) are singularly like those be-
fore us ; and it was held that although the second marriage was
a clear case of evasion of the laws of the Commonwealth, it was
valid upon the general rule referred to in the cases already cited.
The court also say : " If it shall be found inconvenient or re-
pugnant to sound principle, it may be expected that the legis-
lature will explicitly enact that marriages contracted within
another State, which if entered into here would be void, shall
have no force within this Commonwealth." There is thus re-
cognized a necessity discussed earlier in this opinion, for ex-
press legislation, if the citizen is to be held bound by the laws

of his State for acts performed by him outside its limits.   Legislation to this end was afterward had. (Rev. Stat. of Mass., ch. 75, § 6; Gen. Stat., ch. 106, § 6.)   Referring to provisions of the act making void marriages between certain parties, or by persons in prescribed conditions or under certain circumstances, it declares, "where persons resident in this State, in order to evade the preceding provisions and with an intention of returning to reside in this State, go into another State or country and there have their marriage solemnized, and afterward return and reside here, the marriage shall be deemed void in this State." It is not necessary to consider the extent or scope of this statute. It has been discussed by the courts of that State, and is said by DEWEY, J., in *Com.* v. *Hunt* (4 Cush. 49), "to have been intended to meet this class of cases, that is, of individuals fraudulently attempting to evade the law of Massachusetts, so far as respects persons divorced for the crime of adultery, and to declare such marriages by the guilty party to be void in this Commonwealth;" or as HUBBARD, J., says, in *Sutton* v. *Warren* (10 Metc. 453): "The only object of this provision is, as stated by the commissioners in their report, to enforce the observance of our own laws upon our own citizens, and not suffer them to violate regulations founded in a just regard to good morals and sound policy."   We have no law in relation to this subject similar to that of Massachusetts or our statutes before cited in reference to dueling and treason.   There is nothing in the statute to indicate an intention of the legislature to reach beyond the State to inflict a penalty.   Nor can I discover an intent so to impress the citizen with the prohibition as to make an act, which is innocent and valid when performed, an offense when he returns to this State and himself a criminal for performing it.   Every presumption is against such intention.   The respondents rest their case upon the general words of the statute.   These, taken in their natural and usual sense, would undoubtedly embrace the case of the appellant.   "No second * * * marriage shall be contracted by any person during the life-time of any former wife of such person."   "Every such marriage shall be absolutely void."   "No

defendant convicted of adultery shall marry again until the death of the complainant." Equally broad are the provisions of the criminal law declaring the punishment of the offender. They would comprehend every second marriage wherever celebrated, and take in the citizens of every State. It cannot be denied that they are subject to explanation and restraint. *Mosher* v. *The People* (*supra*), and the principle on which it rests, shows the criminal law to have no application to a marriage out of the State. The same rule was applied in *Sims* v. *Sims* (75 N. Y. 466), where, after a very full discussion of the question involved, it was decided that the provision of the Revised Statutes (2 R. S. 701, § 23), declaring a person sentenced upon a conviction for felony to be incompetent as a witness, does not apply to a conviction in another State; that it has reference only to a conviction in this State. The conviction was in Ohio; it was assumed that the convict would have been incompetent as a witness in this State. Suppose a judgment here followed his evidence, and it was afterward prosecuted in Ohio. Would it be competent in defense to show that it was obtained upon evidence inadmissible by the laws of Ohio? Clearly not. And the reason is stated in the case cited: " The disqualification is in the nature of an additional penalty following and resulting from the conviction and cannot extend beyond the territorial limits of the State where the judgment was pronounced." He was, therefore, a competent witness in the State of New York. There is in principle a close analogy between the case I have supposed and the one before us. In each there is a personal disqualification. In one, to marry; in the other, to testify. In neither case does the disqualification arise from any law of nature or of nations, but simply from positive law. Each deprives the offender of a civil right. Now in case of the witness, his testimony in New York results in a judgment, a contract of record, to which, when it reaches Ohio, full effect must be given, and for its enforcement the machinery of the law of that State put in motion. In the other case — that in hand — a contract is entered into by the offender, which is a good contract under the laws of

the State where made. If so, it should also follow that to each party thereto and to their issue every right and privilege growing out of the relation so established must attach. When, therefore, they return to this State with the evidence of that contract, can the courts do more than in the other case? Are they not limited to the inquiry whether the contract was valid in the State where made? And if it was, how can they deny to the child its inheritance? Let me go a little further. Suppose, on the day the decree of divorce was granted, Barker had also been convicted and sentenced for a felony. He would then have been subject not only to the statutes above cited, but to that other which declares "that no person sentenced upon a conviction for felony shall be competent to testify in any cause." (2 R. S. 701, § 23.) Disqualified therefore to marry or to testify, he does both in Connecticut, brings back to this State the judgment record and the marriage contract. If the first cannot be impeached because of his sentence, neither, as it seems to me, can the other, because of his "conviction." And for the same reason, viz.: that stated by Greenleaf as the result of the weight of modern opinion, sanctioned by this court in *Sims* v. *Sims* (*supra*), that personal disqualifications arising, not from the laws of nature, but from positive laws, especially such as are of a penal nature, are strictly territorial and cannot be enforced in any country other than that in which they originated. (1 Gr. Ev., § 376.)

*Second:* Nor are we, in the absence of express words to that effect, to infer that the legislature of this State intended its laws to contravene the *jus gentium* under which the question of the validity of a marriage contract is referred to the *lex loci contractus*, and which is made binding by consent of all nations. It professedly and directly operates on all. To impugn it, is to impugn public policy. And while each country can regulate the status of its own citizens, until the will of the State finds clear and unmistakable expression that must be controlling. "Where," says MARSHALL, Ch. J. (*U. S.* v. *Fisher*, 2 Cranch, 389), "rights are infringed, where fundamental principles are overthrown, where the general

system of the laws is departed from, the legislative intention must be expressed with irresistible clearness to induce a court of justice to suppose a design to effect such objects."

Our conclusion is, that as the marriage in question was valid in Connecticut, the appellant Rose Van Voorhis is a legitimate child of Barker, and as such entitled to share in the estate of the testator.

The judgment should be reversed and a new trial granted, without costs to the plaintiffs or Sarah A. Brintnall, but with costs to the appellant Rose Van Voorhis and the respondents Ella and Elias, to be paid out of the estate.

All concur, except FOLGER, Ch. J., not voting.

Judgment reversed.