OPINION OF THE COURT
Laura E. Drager, J.
In this divorce action arising out of a same-sex marriage entered into in Canada, defendant moves for dismissal of the action on the grounds that the marriage is void under New York law. In her cross motion, plaintiff asks this court to determine whether the plaintiff has continuing custodial rights and support obligations for the children born immediately before and during the marriage.
Plaintiff is in her late 40s and is a senior vice-president of a media industry company. Defendant, also in her 40s, holds a staff position at a magazine and sells goods on eBay. They met in late 1999 and soon thereafter entered into an intimate relationship. In May 2002, plaintiff moved into defendant’s Manhattan apartment.
In February 2003, defendant became pregnant by means of artificial insemination. In that same year, Ontario became the first Canadian province to legalize marriage for same-sex couples. Prior to the birth of the child, the parties traveled to Toronto in September 2003 and obtained a marriage license. They planned to marry on Monday, September 8, 2003. However, during the weekend preceding that date, defendant’s father died unexpectedly and they postponed the wedding. His obituary, prepared by defendant, referred to plaintiff as his daughter-in-law (plaintiffs cross motion, exhibit A). During September and October, family members and friends held baby showers for the couple. Defendant gave birth to a daughter (J.R.) on October 20, 2003. Plaintiff was present in the delivery room. She coached defendant during the delivery process and cut the umbilical cord. Each party took maternity leave (one after the other) so that one of them would be present with the child for her first four months.
*726 When J.R. was 3V2 months old, the parties traveled to Toronto to obtain a new marriage license since the first license had expired (plaintiffs cross motion, exhibit B). They were married on February 14, 2004 surrounded by family and friends who had traveled to Toronto to be present. J.R. was carried down the aisle.
In July 2005, defendant was again impregnated by artificial insemination. Plaintiff paid for the procedure. On March 30, 2006, defendant gave birth to another daughter (S.R.). Plaintiff was present in the delivery room and cut the umbilical cord.
Defendant did not allow plaintiff to adopt either child. Nonetheless, each child was given plaintiffs last name as reflected on the children’s birth certificates (plaintiffs reply, exhibits C, D). Birth announcements, prepared by the couple, were sent to family members and friends giving the children’s last name and reflecting the use by defendant of plaintiffs last name as well (plaintiffs cross motion, exhibit F). The birth announcement for J.R. reads “We joyfully announce the arrival of our daughter . . . [defendant and plaintiff] R.” The announcement for S.R. reads “We joyfully announce the birth of [S.R.] . . . Delighted parents and big sister [defendant, plaintiff and J.R.].” At some point, defendant prepared return address labels for the family’s mail that read, “The [R.] Family,” and lists both parties and the two children as members of the R. family (plaintiffs cross motion, exhibit G).
In April 2004, plaintiff added defendant and J.R. to her health insurance plan. She claims she was able to do so only because she and defendant were married. When born, S.R. received coverage as well. The medical costs associated with S.R.’s birth were covered by plaintiffs insurance (plaintiffs cross motion, exhibits H, I).
Each party obtained life insurance naming the other party as beneficiary. Defendant prepared a will naming plaintiff as guardian of the children. Plaintiffs will left property to defendant.
The parties taught J.R. to call plaintiff “mom” and defendant “mommy.” J.R. calls plaintiff’s mother “nana” and refers to plaintiffs siblings as “aunt” and “uncle.”
Each party cared for the children and contributed to their support. The parties participated together in making important decisions for the children, such as the selection of a pediatrician and a nanny. Together they explored options and decided on a preschool and camp for J.R. In September 2006, without objec *727 tion by defendant, plaintiff completed the school application form, listing each party as a parent. She signed the medical and trip authorization forms (plaintiff’s cross motion, exhibit H). Each party contributed to the cost of the school and participated in parent activities. They each attended parent-teacher conferences and the child’s school events.
In September 2006, when J.R. was three years old and S.R. was six months old, defendant announced that she wanted to end the marriage. The parties continued to reside together in defendant’s apartment until the spring of 2007. During that period, plaintiff slept in the bedroom with S.R. The children and defendant remained on plaintiff’s medical insurance plan and plaintiff continued to make school tuition payments.
On April 17, 2007, defendant filed and served a notice to quit on plaintiff to remove her from the apartment. On April 24, 2007, plaintiff filed the instant divorce action. Pending resolution of the instant motion and cross motion, the parties entered into a stipulation in which it was agreed that plaintiff would remove herself from defendant’s apartment and an access schedule was set providing plaintiff visitation with the children alternate weekends from Friday after school until Sunday evening, as well as dinners with the children on Tuesday and Thursday evenings on alternate weeks (stipulation dated May 11, 2007).
Defendant moves for dismissal of this action. She contends that the marriage is void under New York law. Since there is no marriage, there can be no action for divorce. (CPLR 3211 [a] [3], [7].)[1] Defendant relies on the finding by the Court of Appeals that New York prohibits the marriage of same-sex couples. (Hernandez v Robles, 7 NY3d 338 [2006]; see also Funderburke v New York State Dept. of Civ. Serv., 13 Misc 3d 284 [Sup Ct, Nassau County 2006].) Defendant’s motion is denied. (Martinez v County of Monroe, 50 AD3d 189 [4th Dept 2008].)
The right to marry is a statutory right. The Court of Appeals in Hernandez said no more than that the Domestic Relations Law does not authorize same-sex couples to marry in New York and that no constitutional imperative required the court to interfere with that law as enacted by the legislature. The issue in that case arose as a result of the effort of same-sex couples to *728 obtain marriage licenses within New York. Hernandez did not address what effect New York should give to a validly entered out-of-state same-sex marriage.
Absent overriding legislation, recognition of out-of-state marriages is governed by common-law doctrines and comity. New York courts have long held that out-of-state marriages, if valid where entered, will be respected in New York even if under New York law the marriage would be void. “[I]t is a general rule of law that a contract entered into in another State or country, if valid according to the law of that place, is valid everywhere. . .
. [T]he rule recognizes as valid a marriage considered valid in the place where celebrated.” (Van Voorhis v Brintnall, 86 NY 18, 24-25 [1881].) There are only two exceptions to this rule. New York will not recognize either a marriage prohibited by positive law of this state or a marriage abhorrent to New York public policy. The abhorrence exception is so narrow that it has been applied only to marriages involving polygamy or incest. (Van Voorhis, supra; Thorp v Thorp, 90 NY 602 [1882]; Matter of May, 305 NY 486 [1953]; Martinez, supra.)
Yet even an out-of-state incestuous marriage has been recognized as valid within New York. Notwithstanding this state’s statutory provision voiding incestuous marriages, the Court of Appeals upheld as valid a Rhode Island marriage between an uncle and niece. (Matter of May, supra.) The parties were New York domiciliaries who left the state solely for the purpose of getting married and then returned to live in New York.
“Although the New York statute . . . declares to be incestuous and void a marriage between an uncle and a niece and imposes penal measures upon the parties thereto, it is important to note that the statute does not by express terms regulate a marriage solemnized in another State where, as in our present case, the marriage was concededly legal. . . .
“As . . . the New York Domestic Relations Law . . . does not expressly declare void a marriage of its domiciliaries solemnized in a foreign State where such marriage is valid, the statute’s scope should not be extended by judicial construction. Indeed, had the Legislature been so disposed it could have declared by appropriate enactment that marriages contracted in another State — which if entered into here would be void — shall have no force in this State.” (305 NY at 492 [citation omitted].)
*729 Thus, the court concluded that no positive law of this state precluded recognition of the marriage.[2]
Courts have recognized other out-of-state marriages that are repugnant under New York law. Historically, New York law prohibited a respondent who was divorced on the grounds of adultery from remarrying during the former spouse’s life. Yet the respondent’s remarriage in another state was recognized as valid in New York if the other state did not preclude the remarriage of an adulterer. (Van Voorhis, supra; Thorp, supra; Moore v Hegeman, 92 NY 521 [1883].) A valid out-of-state marriage that was voidable under New York law because a spouse was underage was recognized as valid in New York. (Donohue v Donohue, 63 Misc 111 [Sup Ct, Erie County 1909]; Hilliard v Hilliard, 24 Misc 2d 861 [Sup Ct, Greene County I960].) Common-law marriages, although not recognized in New York, will be upheld if validly entered into under the laws of another state. (Matter of Mott v Duncan Petroleum Trans., 51 NY2d 289 [1980]; Matter of Farber v U.S. Trucking Corp., 26 NY2d 44 [1970]; Lancaster v 46 NYL Partners, 228 AD2d 133, 141 [1st Dept 1996]; Matter of Yao You-Xin, 246 AD2d 721 [3d Dept 1998]; Carpenter v Carpenter, 208 AD2d 882 [2d Dept 1994]; Matter of Coney v R.S.R. Corp., 167 AD2d 582 [3d Dept 1990].) New York recognizes as valid out-of-state marriages by proxy, although such marriages cannot be performed within New York. (Fernandes v Fernandes, 275 App Div 777 [2d Dept 1949]; Matter of Valente, 18 Misc 2d 701 [Sur Ct, Kings County 1959].)
Recent pronouncements by statewide and local executive branch offices support this court’s conclusion that out-of-state same-sex marriages are properly recognized under our law. For example, prior to the Court of Appeals decision in Hernandez, then Attorney General Elliot Spitzer issued an opinion in which his office concluded that although the legislature did not intend to authorize same-sex marriages under the Domestic Relations Law, “New York law presumptively requires that parties [to same-sex marriages from other jurisdictions] must be treated as spouses for purposes of New York law.” (2004 Ops Atty Gen No. 2004-1, at 16.) This same conclusion was reached by current Attorney General Andrew Cuomo even after the Hernandez deci *730 sion. (See Jan. 18, 2007 reply mem in further support of defendant’s motion to dismiss [Godfrey v Hevesi, Sup Ct, Albany County, No. 5896/06].) The New York State Comptroller issued a letter to the same effect, enabling spouses of out-of-state same-sex marriages to receive certain benefits through the New York State Retirement System. (Letter of NY Comptroller Alan G. Hevesi to Mark E. Daigneault, Oct. 8, 2004.) New York City reached the same conclusion with respect to certain benefits pursuant to its pension system. (Letter of Corporation Counsel Michael A. Cardozo to Hon. Michael R. Bloomberg, dated Nov. 17, 2004.)[3] Most recently, and well after Hernandez, the New York State Department of Civil Service announced its policy to recognize as valid out-of-state same-sex marriages for the purpose of providing spousal benefits under the New York State Health Insurance Program and other department-administered benefit programs. (NY Dept Civ Serv, Employee Benefits Division Policy Mem No. 2007-08, dated Apr. 27, 2007.)
As the Martinez court noted,
“Hernandez . . . holds merely that the New York State Constitution does not compel recognition of same-sex marriages solemnized in New York. The Court of Appeals noted that the Legislature may enact legislation recognizing same-sex marriages and, in our view, the Court of Appeals thereby indicated that the recognition of [a same-sex] marriage is not against the public policy of New York.” [Martinez, 50 AD3d at 192 [citations omitted].)
Accordingly, defendant’s motion to dismiss this divorce action on the grounds that the parties’ Canadian marriage is void under New York law is denied.
Plaintiff seeks to have this court determine whether the children are entitled to plaintiffs continuing custodial care and financial support. Plaintiff argues that she is entitled to maintain an on-going relationship with and obligation to support the children. She moves for appointment of a law guardian to represent the best interests of the children. Defendant opposes the application. She contends that since the children were *731 not adopted by plaintiff she lacks standing to pursue any right to an ongoing relationship with them. (Matter of Alison D. v Virginia M., 77 NY2d 651 [1991]; Matter of Ronald FF. v Cindy GG., 70 NY2d 141 [1987].)
In Alison D. the Court of Appeals denied visitation rights to the former partner of a same-sex relationship on the grounds that, as a biological stranger to the child, she could not be deemed a “parent” under Domestic Relations Law § 70. The petitioner had argued that, although she was not a “parent” either biologically or by virtue of adoption, her substantial relationship to the child resulted in her being a “de facto” parent or that she should be viewed as a parent “by estoppel.” The court rejected the application of equitable estoppel and concluded that, where the biological parent is fit, the state will not interfere with that parent’s custodial choices. (See Matter of Ronald FF, supra; Matter of Bennett v Jeffreys, 40 NY2d 543 [1976].)
In her dissent, Chief Judge Kaye noted that the word “parent” is not defined by statute. Where a term is undefined, it is for the courts to give definition to the term to effectuate the legislative purpose. She concluded that the narrow reading of the term “parent,” given by the majority, precluded the court from advancing the legislative intent. “The Legislature has made plain an objective in section 70 to promote ‘the best interest of the child’ and the child’s ‘welfare and happiness.’ Those words should not be ignored by us in defining standing for visitation purposes . . .” (77 NY2d at 659 [citation omitted]).
In the 17 years since Alison D., under constraint of that decision, courts have continued to deny the proactive efforts of a nonbiological, nonadoptive domestic partner or spouse to obtain custodial rights, notwithstanding the ties that may have developed between that person and the child. (Anonymous v Anonymous, 20 AD3d 333 [1st Dept 2005]; Matter of Multari v Sorrell, 287 AD2d 764 [3d Dept 2001]; Matter of Janis C. v Christine T., 294 AD2d 496 [2d Dept 2002]; Matter of Speed v Robins, 288 AD2d 479 [2d Dept 2001]; Matter of Lynda A.H. v Diane T.O., 243 AD2d 24 [4th Dept 1998].)
However, parallel to that developing case law has been the continued use of equitable estoppel as a defense where a person, typically a nonbiological father, seeks to avoid child support obligations or the biological father belatedly seeks recognition of his parental rights. (Matter of Diana E. v Angel M., 20 AD3d 370 [1st Dept 2005]; Hammock v Hammock, 291 AD2d 718 [3d *732 Dept 2002]; Fung v Fung, 238 AD2d 375 [2d Dept 1997]; Purificati v Paricos, 154 AD2d 360 [2d Dept 1989].)
In 2006, the Court of Appeals directly addressed the application of the doctrine of estoppel in paternity and support proceedings. In Matter of Shondel J. v Mark D. (7 NY3d 320 [2006]), the court found that the respondent, who never married the mother and was not the biological father of the woman’s child, was equitably estopped from denying paternity. In that case, the child was believed to be the product of a brief liaison between the respondent and the mother. The respondent initially acknowledged paternity and provided some financial support. He had intermittent visitation with the child, although he was often not even in the same country as the mother and child. Four years after the child’s birth, it was determined that he was not the biological father.
The court found that the respondent was equitably estopped from raising the issue of paternity, both by statute (Family Ct Act § 418 [a]; § 532 [a]) and at common law. The court concluded that both the statute and case law required that the best interests of the child controlled whether a person was required to continue support payments, even if it was belatedly determined that he was not the biological parent.
“The potential damage to a child’s psyche caused by suddenly ending established parental support need only be stated to be appreciated. Cutting off that support, whether emotional or financial, may leave the child in a worse position than if that support had never been given. . . . [T]he issue does not involve the equities between the two adults; the case turns exclusively on the best interests of the child.” (7 NY3d at 330 [emphasis added].)
In support of this conclusion, the court cited favorably to Jean Maby H. v Joseph H. (246 AD2d 282 [2d Dept 1998]). That case, however, did not concern the application of equitable estoppel as a defense in a paternity or support proceeding. Rather, Jean Maby H. addressed the question of whether a nonbiological parent may offensively invoke the doctrine of equitable estoppel to preclude a biological parent from cutting off custody or visitation with a child.
The parties in Jean Maby H. began dating when the woman was already pregnant as a result of a relationship with another man. The parties lived together after the child was born for two years before getting married. Five years after the marriage, the *733 wife commenced the divorce action. The husband cross-moved for custody of the child.
The trial level court found that, although knowing the husband was not related to the child, the wife held him out to the world as the father, including to the child’s doctors, school, family and friends and for purposes of obtaining medical insurance. She also accepted financial support from him for the child. Notwithstanding these findings, the court felt constrained by Alison D. and Ronald FF. to deny the husband’s request for custody or visitation since the wife was not an unfit mother.
The Second Department reversed, finding:
“[T]he doctrine of equitable estoppel ‘is imposed by law in the interest of fairness to prevent the enforcement of rights which would work [a] fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party’s words or conduct, has been misled into acting upon the belief that such enforcement would not be sought’ . . .
“Courts have recognized the availability of this doctrine as a defense in various proceedings involving challenges to paternity . . .
“The paramount concern in applying equitable estoppel in these cases has been, and continues to be, the best interests of the child . . .
“[I]t is inconsistent to estop a nonbiological father from disclaiming paternity in order to avoid supporting the child, but preclude a nonbiological father from invoking the doctrine against the biological mother in order to continue a long-standing relationship with the child. It would seem particularly appropriate to apply the doctrine under the circumstances in this case. . . .
“[W]e are of the opinion that the best interests of the child will not be served in this case if Matter of Ronald FF. (supra) and Matter of Alison D. (supra) are blindly applied.” (246 AD2d at 285-289 [citations omitted; emphasis added]; see also Matter of Christopher S. v Ann Marie S., 173 Misc 2d 824 [Fam Ct, Dutchess County 1997].)
Given the many cases that have authorized equitable estoppel as a defense to paternity proceedings, this court concludes that it is not mere coincidence that in Shondel J. the Court of Appeals cited to Jean Maby H. If the concern of both the legislature *734 and the Court of Appeals is what is in the child’s best interest, a formulaic approach to finding that a “parent” can only mean a biologic or adoptive parent may not always be appropriate.[4]
In reliance on Shondel J. and Jean Maby H., this court concludes that the facts here warrant granting plaintiffs motion to enable this court to determine whether the best interests of the children warrant granting custodial rights to plaintiff. Although defendant did not allow the adoption of the children, she held out plaintiff to the world, and, most important, to the children, as their parent. The children were given plaintiffs last name. The birth announcements presented plaintiff as the parent of each child. J.R. was encouraged to call plaintiff “mom” and plaintiffs relatives by familial titles. The extended families of each party were encouraged to treat plaintiff as a parent. Defendant held out plaintiff as a parent to the children’s nanny, doctor and J.R.’s teachers and school administrators. Defendant accepted health insurance and financial contributions from plaintiff for the benefit of the children.
An additional factor is the marriage. Although defendant seeks to minimize the significance of the act of marriage, the law does not share her view. Marriage is “a status founded on contract and established by law. It constitutes an institution involving the highest interests of society. It is regulated and controlled by law based upon principles of public policy affecting the welfare of the people of the State.” (Fearon v Treanor, 272 NY 268, 272 [1936].) As a result of being married, plaintiff may be constrained to provide support for the defendant and defendant would be a recipient of a portion of plaintiffs estate. These factors significantly affect the children’s welfare. Moreover, although people enter into marriages for many reasons, creating familial bonds is one of the most significant reasons, particularly for the benefit of their children. The parties here were clearly committed to becoming married, having traveled *735 twice to Canada and having obtained two marriage licenses. It is noteworthy that the defendant voluntarily entered into the marriage after her first child was born. Furthermore, as plaintiff argues, the artificial insemination during the marriage resulting in the birth of S.R. may require a finding that she is the legitimate child of both parents. (Domestic Relations Law § 73; State of New York ex rel. H. v P., 90 AD2d 434 [1st Dept 1982]; Laura G. v Peter G., 15 Misc 3d 164 [Sup Ct, Delaware County 2007].)
A child by the age of three clearly identifies with parental figures. The abrupt exclusion of a parental figure may be damaging to the emotional well-being of that child. Although only an infant, it is conceivable that S.R. might suffer emotional consequences as well and she may well be considered the legitimate child of both parents having been born during the marriage. Certainly both children might suffer financial consequences due to the loss of support that would be available to them from plaintiff. The best interests of the children require exploration of their custodial and support needs as between the parties to this action. (Domestic Relations Law § 70.)
Accordingly, it is hereby ordered that defendant’s motion is denied; and it is further ordered that plaintiffs cross motion is granted to the extent that the parties will appear in court on March 24, 2008 at 9:30 a.m. for a conference to address the custodial issues of this action.

. This is the sole basis on which defendant seeks dismissal of the action. Plaintiff has not yet served a complaint.

. The court also found that the religious qualifications of the Rhode Island statute supported the conclusion that the incestuous marriage before the court was not offensive to the public sense of morality to a degree regarded generally with abhorrence and, thus, was not within the inhibitions of natural law.

. The marital status of either a New York State or New York City employee has no effect on the disbursement of most survivor benefits since benefits typically go to a designated beneficiary. However, some limited benefits are available only to a spouse, parent or child. The letters indicate that both New York State and New York City recognize the partner of an out-of-state same-sex marriage as a spouse.

. Of course, as noted by then Judge Kaye, there must be limitations set on who can petition for visitation.
“Domestic Relations Law § 70 specifies that the person must be the child’s ‘parent,’ and the law additionally recognizes certain rights of biological and legal parents. Arguments that every dedicated caretaker could sue for visitation if the term ‘parent’ were broadened, or that such action would necessarily effect sweeping change throughout the law, overlook and misportray the Court’s role in defining otherwise undefined statutory terms to effect particular statutory purposes, and to do so narrowly, for those purposes only.” (Alison D., 77 NY2d at 661.)