OPINION OF THE COURT
 

 Levine, J.
 

 Decedent Stacey Crair received injections of Human Growth Hormone (HGH) from 1966 to 1978, some of which, it is claimed in this action, were contaminated with the viral disease that killed her. Plaintiff Lisa Crair, decedent’s sister, brought this action on her behalf against the entities allegedly involved in the manufacture and distribution of HGH, including defendants University of Virginia and University of Maryland. Concededly, actions against the defendant universities, as instrumentalities of their respective States, are subject to statutory notice of claim provisions imposed as a condition precedent to suit against those States. The dispositive issue in this case is whether New York should apply the notice of claim provisions of Virginia and Maryland under principles of comity.
 

 According to plaintiff’s pleadings and averments on defendants’ motions to dismiss, in 1966, when decedent was five years old, she was found to have short stature because her pituitary gland was failing to secrete HGH. Decedent was treated with injections of HGH, which came from the pituitaries of human cadavers. Her treating physician was a professor of medicine at Johns Hopkins University who was directing a program, funded by the National Institutes of Health, for the systematic collection, preservation, storage and distribution of hormones derived from human pituitaries. Beginning in 1967, the program was operated by the University of Maryland, which supplied decedent’s doctor with the HGH for decedent. Vials of HGH were sent to decedent’s home in Brooklyn, where injections were administered by her family. From 1975 to 1977, after decedent’s physician moved to the University of Virginia, decedent continued to receive HGH from him as before. Some of the HGH was contaminated with a virus that causes Creutzfeldt-Jakob Disease, an incurable and fatal neurodegenerative brain disorder. Decedent was first diagnosed with that disease, and told that its source was the HGH injections, in August. 1993. By September 1993, she had begun showing signs of dementia and global cognitive decline, such as chronic urinary incontinence, tremor and an inability to speak or follow commands. She died from the disease in September 1997.
 

 Decedent first filed suit on January 20, 1995, but the University of Virginia moved to dismiss the action based upon
 
 *528
 
 improper service of process. Plaintiff was appointed, decedent’s guardian ad litem in March 1995. By stipulation, plaintiff agreed to discontinue the previous action without prejudice to commence the instant one. On July 9, 1996, plaintiff brought this second action, joining the University of Maryland as well as the University of Virginia and other defendants who were connected with the production and distribution of HGH. The complaint alleges that defendants designed, manufactured, inspected, tested, sold, distributed, extracted or purified the contaminated HGH product. Plaintiff sought to hold defendants liable under a variety of legal theories, including negligence and strict products liability.
 

 Both university defendants moved to dismiss for lack of subject matter jurisdiction on the ground that plaintiff never filed notices of claim as required by Virginia and Maryland law as a condition precedent to actions against those States. Supreme Court granted these motions and dismissed the complaint against these defendants. The court found that the notice of claim provisions in the Virginia and Maryland Tort Claims Acts had not been complied with and concluded that New York should apply the laws of those States to bar the action under the doctrine of comity. The Appellate Division affirmed (259 AD2d 586). Having granted leave to appeal, we likewise affirm.
 

 The primary issue in this case is whether New York should apply the Virginia and Maryland notice of claim provisions for suits against those States. Neither the Full Faith and Credit Clause nor any other provision of the United States Constitution requires New York to apply Virginia and Maryland’s notice of claim provisions
 
 (see, Nevada v Hall,
 
 440 US 410). The Supreme Court has held that the Constitution does “not imply that any one State’s immunity from suit in the courts of another State is anything other than a matter of comity”
 
 (id.,
 
 at 425). The Full Faith and Credit Clause does not require a State to apply another State’s law in violation of its own legitimate public policy, even where the other State’s law is controlling in the courts of the State of its enactment
 
 (id.,
 
 at 422-423). Stated differently, the Constitution does not require the application of another State’s laws when they are “obnoxious” to the forum State’s policy
 
 (id.,
 
 at 423-424, quoting
 
 Pacific Empls. Ins. Co. v Industrial Acc. Commn.,
 
 306 US 493, 504).
 

 Thus, in
 
 Ehrlich-Bober & Co. v University of Houston
 
 (49 NY2d 574), we held that New York would apply the laws of other States where the application of those laws does not
 
 *529
 
 conflict with New York’s public policy
 
 (id.,
 
 at 580). In that case, the plaintiff was a securities dealer seeking damages arising out of securities transactions with the University of Texas, an agency of the State of Texas
 
 (id.,
 
 at 577). Texas law provided that a suit could be brought only in two specified counties in Texas, but the plaintiff sought to sue in New York
 
 (id.,
 
 at 578). In our discussion of whether, as a matter of comity, New York should abide by the venue provisions of the Texas law, we explained that
 

 “one State’s entirely voluntary decision to defer to the policy of another * * * may be perceived as promoting uniformity of decision, as encouraging harmony among participants in a system of cooperative federalism, or as merely an expression of hope for reciprocal advantage in some future case in which the interests of the forum are more critical. * * * [T]he determination of whether effect is to be given foreign legislation is made by comparing it to our own public policy; and our policy prevails in case of conflict”
 
 (id.,
 
 at 580).
 

 Applying these principles, the Court characterized the Texas statute as a “restrictive venue provision put in place to serve the administrative convenience of the State. It is not * * * an attempt to limit the liability of the State so as to safeguard the public fisc, a limitation which, conceivably might be found essential to the governmental function”
 
 (id.,
 
 at 581). Arrayed against Texas’s policy was New York’s interest, “as the preeminent commercial and financial nerve center of the Nation and the world,” in “assuring ready access to a forum for redress of injuries arising out of transactions spawned here”
 
 (id.).
 
 New York “administers a known, stable, and commercially sophisticated body of law,” and such a forum “may be considered as much an attraction to conducting business in New York as its unique financial and communications resources”
 
 (id.).
 
 Since the transactions at issue were centered in New York and wholly commercial in character, application of the Texas law conflicted with New York’s public policy, and the Court held that New York should not apply the Texas venue provision as a matter of comity
 
 (id.,
 
 at 581-582).
 

 Morrison v Budget Rent A Car Sys.
 
 (230 AD2d 253) also involved a restrictive venue provision. The issue was whether New York would afford comity to a provision of the South Carolina Tort Claims Act under which South Carolina did not
 
 *530
 
 consent to be sued in any other State’s courts
 
 (id.,
 
 at 263). The plaintiff was a New York resident involved in a car accident in New York with an employee of the State of South Carolina. The Court perceived a conflict in policy in that New York was far more open in providing a forum for suits against the State, even by out-of-State residents. The Court also recognized New York’s significant interest in providing its residents a forum for redress on a cause of action arising in this State
 
 (id.,
 
 at 268). The Court contrasted the facts of that case with a situation in which the “State’s interest would not be disserved by according immunity through comity”
 
 (id.).
 

 Plaintiff argues that we should not apply the Tort Claims Acts of Virginia and Maryland because they also contain restrictive venue provisions similar to those rejected in
 
 Ehrlich-Bober
 
 and
 
 Morrison (see,
 
 Va Code Annot § 8.01-195.4; Md Code Annot [State government] § 12-104 [a] [1]). In this case, however, Virginia’s and Maryland’s motions to dismiss were not granted on the ground that plaintiff filed suit in New York. Rather, defendants prevailed because plaintiff never filed notices of claim as required by the Maryland and Virginia tort claims statutes.
 

 Nevertheless, plaintiff maintains that the application of the notice of claim provisions in this case undermines New York’s public policy. She argues that if she had been suing New York State, she could have commenced her action by filing a claim or a notice of intention to file a claim in New York’s Court of Claims at the time she brought this action. Even assuming this to be true, the infirmity of plaintiff’s argument is that in suits against the State of New York brought in the Court of Claims, the filing of a claim can serve the dual purpose of,giving notice and commencing the action
 
 (see,
 
 Court of Claims Act § 10 [3]). With respect to the Virginia and Maryland statutes, by contrast, the requirement is solely to provide notice and is a condition precedent to commencement of a suit.
 

 While New York has a somewhat different procedure for suits against the State in our Court of Claims, as a general matter a requirement of filing a notice of claim with a governmental entity as a condition precedent to suit is not against New York’s public policy. To the contrary, New York’s statutes are replete with such provisions to restrict suits against public authorities and various kinds of municipal entities
 
 (see, e.g.,
 
 CPLR 9801, 9802 [villages]; County Law § 52 [counties]; General Municipal Law § 50-e [cities]; Public Authorities Law §§ 569-a [Triborough Bridge and Tunnel Authority], 1212 [New York City Tran
 
 *531
 
 sit Authority], 1276 [Metropolitan Transportation Authority]; McKinney’s Uncons Laws of NY §§ 7107 [Port Authority of New York and New Jersey], 7401 [New York City Health and Hospitals Corporation]). Indeed, New York statutes restrict suits against educational institutions not unlike those plaintiffs sued here (see, Education Law § 6224 [City University of New York]).
 

 Here, it is uncontroverted that no formal notice of claim was ever filed in either State. Under such circumstances, our case law upholds dismissal (see,
 
 Lichtenstein v State of New York,
 
 93 NY2d 911, 912-913;
 
 Dreger v New York State Thruway Auth.,
 
 81 NY2d 721, 724;
 
 Parochial Bus Sys. v Board of Educ.,
 
 60 NY2d 539, 547-548). Moreover, New York has upheld the strict application of notice of claim provisions, even if the defendant has actual knowledge of its potential liability (see,
 
 Thomann v City of Rochester,
 
 256 NY 165, 172 [Cardozo, Ch. J.] [“What satisfies the statute is not knowledge of the wrong. What the statute exacts is notice of the ‘claim’”]). Thus, the application of the Virginia and Maryland statutes to bar plaintiff’s cause of action because of plaintiff’s failure to file notices of claim does not contravene the public policy of New York.
 

 Alternatively, plaintiff argues that, even if we were to enforce the Virginia and Maryland notice of claim statutes under the comity doctrine, the University of Virginia’s motion to dismiss should not have been granted because of plaintiff’s substantial compliance with the requirements of the Virginia statute. Her argument is that, giving effect to the tolling provisions of the Virginia Tort Claims Act, she had one year from her appointment as guardian ad litem in March 1995 to file her notice of claim “with the Director of the Division of Risk Management or the Attorney General” (Va Code Annot § 8.01-195.6). Plaintiff argues that she substantially complied by commencing the previous suit prior to March 1996 and addressing correspondence relating to the case to the Virginia Attorney General’s office.
 

 Concededly, however, she filed no formal notice with the appropriate office, and thus all that she has established is that the State official with whom the notice must be filed had actual notice of the claim. The Supreme Court of Virginia has held that “actual notice does not obviate [the] duty to strictly comply with the [Virginia Tort Claims] Act’s notice provisions”
 
 (Halberstam v Commonwealth of Virginia,
 
 251 Va 248, 252, 467 SE2d 783, 785). Plaintiff’s reliance on
 
 Miles v City of Richmond
 
 (236 Va 341, 373 SE2d 715) is misplaced. That case
 
 *532
 
 held that a statute requiring the filing of a notice of claim against a city was “to be construed liberally and substantial compliance with its terms is sufficient”
 
 (id.,
 
 at 344, at 717). By contrast, the Virginia Tort Claims Act “is a statute in derogation of the common law doctrine of sovereign immunity and, therefore, must be strictly construed”
 
 (see, Halberstam v Commonwealth of Virginia, supra,
 
 at 250, at 784). Hence, plaintiff has not established any effective compliance with the Virginia notice of claim requirement.
 

 Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Bellacosa, Ciparick, Wesley and Rosenblatt concur; Judge Smith taking no part.
 

 Order, insofar as appealed from, affirmed, with costs.