OPINION OF THE COURT
Lucy Billings, J.
I. Background
In this proceeding New York State taxpayers, including state legislators, once again seek the same ruling state taxpayers have sought and been denied in prior proceedings: that marriages validly entered outside New York State between partners of the same sex not be recognized in this state. Here, petitioner taxpayers challenge New York State Governor Paterson’s executive directive dated May 14, 2008, and ask the court to declare that the directive contravenes New York law and permanently enjoin the directive’s enforcement, because it exceeds the Governor’s lawful authority. (CPLR 7803 [2], [3]; 7806; State Finance Law § 123-e.)
Relying on Martinez v County of Monroe (50 AD3d 189 [4th Dept 2008], Iv dismissed 10 NY3d 856 [2008]) and consistent lower court decisions, the directive instructs all executive agencies that:
“[A]gencies that do not afford comity or full faith and credit to same-sex marriages that are legally performed in other jurisdictions could be subject to liability. In addition, extension of such recognition is consistent with State policy. . . .
“[I]t is now timely to conduct a review of your agency’s policy statements and regulations, and those statutes whose construction is vested in your agency, to ensure that terms such as ‘spouse,’ ‘husband’ and ‘wife’ are construed in a manner that encompasses legal same-sex marriages, unless some other provision of law would bar your ability to do *643 so.” (Mem from David Nocenti, Counsel to the Governor, to All Agency Counsel [May 14, 2008] [emphasis added]; verified petition, exhibit A.)
Petitioners claim this directive violates State Finance Law § 123-b and the separation of powers under the New York Constitution.
Respondent, Governor Paterson, moves to dismiss the amended petition. (CPLR 406, 409 [b]; 3211 [a]; 3212 [b]; 7804 [d], [f].) Intervenors-respondents, Peri Rainbow and Pamela Sloan, two women married in Canada, move to intervene as respondents to protect their interests in this proceeding (CPLR 401, 406, 409 [b]; 1012, 1013, 7802 [d]), and likewise move to dismiss the amended petition. The court grants their motion to intervene without opposition. After oral argument, for the reasons explained below, the court also grants respondents’ motions to dismiss the amended petition. The Governor’s directive is an incremental but important step toward equality long denied, even if, according to the New York Court of Appeals, full equality is not constitutionally mandated. (Hernandez v Robles, 7 NY3d 338, 356, 361, 366 [2006].)
II. State Finance Law
State Finance Law § 123-b (1) provides that
“a citizen taxpayer, whether or not such person is or may be affected or specially aggrieved by the activity herein referred to, may maintain an action for equitable or declaratory relief, or both, against an officer or employee of the state . . . about to cause a wrongful expenditure ... of state funds . . . .”
A. Collateral Estoppel
In three recent proceedings, other New York taxpayers have invoked State Finance Law § 123-b seeking an adjudication that New York law does not require, but instead bars, recognition of same-sex marriages legally performed in other jurisdictions. In each proceeding, the court decided that issue against the petitioner taxpayers. (Lewis v New York State Dept. of Civ. Serv., NYLJ, Mar. 18, 2008, at 28, col 1, 2008 NY Misc LEXIS 1623, *5-7 [Sup Ct, Albany County 2008]; Godfrey v Hevesi, NYLJ, Sept. 18, 2007, at 28, col 1, 2007 NY Misc LEXIS 6589, **3, 6 [Sup Ct, Albany County 2007]; Godfrey v Spano, 15 Misc 3d 809, 810 [Sup Ct, Westchester County 2007].) Respondents now maintain that under State Finance Law § 123-b, petitioners *644 here must be considered in privity with the taxpayers in those prior actions and collaterally estopped from relitigating that issue. (See David v Biondo, 92 NY2d 318, 324 [1998]; Matter of Juan C. v Cortines, 89 NY2d 659, 667 [1997]; Matter of Energy Assn. of N.Y. State v Public Serv. Commn. of State of N.Y., 273 AD2d 708, 710 [3d Dept 2000]; Landmark West! v City of New York, 9 Misc 3d 563, 567 [Sup Ct, NY County 2005].)
Petitioners dispute not that they are in privity with those other taxpayers, but that the issue decided against them is the same issue petitioners present to the court here. (Buechel v Bain, 97 NY2d 295, 303-304 [2001]; Matter of Juan C. v Cortines, 89 NY2d at 667.) This proceeding, however, does present the identical issue whether New York law bars, permits, or requires recognition of same-sex marriages legally performed in other jurisdictions. Resolution of that issue is central to the May 2008 directive’s legality. Whether or not the prior decisions against other taxpayers on that issue now bars its relitigation in this proceeding, this court is in any event bound by the controlling authority on that issue. (Martinez v County of Monroe, 50 AD3d at 192; see Tzolis v Wolff, 39 AD3d 138, 142 [1st Dept 2007], affd 10 NY3d 100 [2008]; Nachbaur v American Tr. Ins. Co., 300 AD2d 74, 76 [1st Dept 2002].)
Insisting once again that New York law bars recognition of same-sex marriages performed in other jurisdictions, this proceeding challenges the Governor’s directive of May 14, 2008 on the same grounds as prior challenges to other state action. Insofar as this proceeding is the first, however, to challenge this directive, which requires all state agencies to recognize same-sex marriages for a full range of statutory and regulatory purposes, rather than the action of a single public entity or official for a limited purpose, this court concludes, for the reasons explained below, that the directive is entirely lawful.
B. Standing to Seek Judicial Review and Ripeness for Review
Petitioners maintain that the directive’s implementation inevitably will cause the expenditure of state funds through same-sex spouses’ eligibility for insurance benefits, other benefits, and financial assistance to the needy, for which only one partner previously was eligible. The implementation of any state policy surely causes the expenditure of state resources, but standing under State Finance Law § 123-b does not accommodate challenges to nonfiscal activities with a fiscal by-product. (Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801, 813 [2003]; Rudder v Pataki, 93 NY2d 273, 281 [1999]; Matter of *645 Public Util. Law Project of N.Y. v New York State Pub. Serv. Commn., 263 AD2d 879, 881 [3d Dept 1999]; Matter of Gerdts v State of New York, 210 AD2d 645, 647-648 [3d Dept 1994].) In determining whether petitioners’ claims have a close enough nexus to state fiscal activities, the court must determine whether the challenge to expenditures is but a pretense for a challenge to a governmental decision. (Saratoga County Chamber of Commerce v Pataki, 100 NY2d at 813; Rudder v Pataki, 93 NY2d at 281; Matter of Transactive Corp. v New York State Dept. of Social Servs., 92 NY2d 579, 589 [1998]; Kennedy v Novello, 299 AD2d 605, 607 [3d Dept 2002].) On the one hand, a claim, as petitioners maintain, that it is illegal to spend any funds at all for the challenged activity may provide a close enough nexus to fiscal consequences. (Saratoga County Chamber of Commerce v Pataki, 100 NY2d at 813-814.) On the other hand, such a claim may readily reveal that the root of the challenge is the activity and the decision to carry it out, which inevitably have fiscal consequences.
Petitioners have provided few specifics to quell skepticism that their challenge falls in the former rather than the latter category, perhaps because, as yet, neither the immediate nor the ultimate and full ramifications of the directive’s implementation are ascertainable. Consequently, petitioners do not specify what identifiable funds will be spent, the size of the affected populations, or whether counting spouses’ income and assets in determining eligibility for benefits, for example, will render both spouses ineligible and actually save state funds. Without tracing the directive to specific disbursements of state funds, petitioners fail to demonstrate that linkage essential to standing under State Finance Law § 123-b. (Matter of Schulz v State of New York, 217 AD2d 393, 395 [3d Dept 1995]; Matter of Schulz v Cobleskill-Richmondville Cent. School Dist. Bd. of Educ., 197 AD2d 247, 251 [3d Dept 1994].)
While the directive’s issuance does not implicate the expenditure of state funds, its imminent implementation will, albeit in a still unspecified way (Community Serv. Socy. v Cuomo, 167 AD2d 168, 170 [1st Dept 1990]; Childs v Bane, 194 AD2d 221, 225 [3d Dept 1993]), and petitioners claim that each expenditure, whatever it is, will be an unconstitutional disbursement. The directive itself is a final document, bearing the Governor’s imprimatur, already issued and effectuated; it is not a draft or prospective proposal yet to be approved by the issuer or issued. (Cuomo v Long Is. Light. Co., 71 NY2d 349, 354-356 [1988]; *646 Matter of Joint Queensview Hous. Enter. v Grayson, 179 AD2d 434, 436-437 [1st Dept 1992]; see New York Pub. Interest Research Group v Carey, 42 NY2d 527, 531 [1977].) Not only has its issuance occurred, but nothing suggests the actions it requires will not also occur (see Cuomo v Long Is. Light. Co., 71 NY2d at 354; Church of St. Paul & St. Andrew v Barwick, 67 NY2d 510, 518 [1986]; American Ins. Assn. v Chu, 64 NY2d 379, 385 [1985]; Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo, 64 NY2d 233, 240 [1984]); they are “realistic,” not “hypothetical” or “wholly speculative and abstract.” (Id.; see New York Pub. Interest Research Group v Carey, 42 NY2d at 530-531.) Although it may be questionable what harm will ensue from the actions initiated by the directive, that question pertains to wrongfulness (State Finance Law § 123-b [1]), not petitioners’ standing to seek judicial review or the controversy’s ripeness for review.
Concomitantly, this case is not one in which the court’s decision will have no effect or never resolve anything. (CPLR 3001; see Cuomo v Long Is. Light. Co., 71 NY2d at 354; New York Pub. Interest Research Group v Carey, 42 NY2d at 531.) The court may determine the parties’ rights in the event of future actions by respondent Governor’s agents now contemplated by the parties, on the assumption that they will act according to the law, as set forth in the court’s decision. (CPLR 3001; New York Pub. Interest Research Group v Carey, 42 NY2d at 530-531.) The decision will either allow the Governor’s initiative to proceed or, as petitioners seek, halt it in its tracks, saving the expense that is involved and that otherwise would be wasted were the directive and agencies’ amended regulations and policy statements later declared unlawful and enjoined. (Id. at 532; Godfrey v Spano, 15 Misc 3d at 812.) Thus the decision will have an immediate and practical effect on the conduct of the Governor and his agents and will compel and ensure compliance with the law. (CPLR 3001; New York Pub. Interest Research Group v Carey, 42 NY2d at 530-531; Godfrey v Spano, 15 Misc 3d at 812.)
In sum, under State Finance Law § 123-b (1), petitioners’ standing may be tenuous, and as taxpayers they may be collaterally estopped from relitigating a core issue in this proceeding, but the parties and the public are best served by a decision on the merits of the Governor’s action. His action undoubtedly will cause an expenditure of state funds in the immediate future, *647 which undoubtedly would bring petitioners back to court. A decision on the full parameters of this dispute will estop petitioners from relitigating all the issues involved.
Particularly in separation of powers disputes as here, where few persons ordinarily suffer concrete injury from a breach of that “constitutional division of authority,” yet the issues are fundamental and of public significance, a strict test for standing may yield to an adjudication of the constitutional and institutional issues (Saratoga County Chamber of Commerce v Pataki, 100 NY2d at 814; see Matter of Korn v Gulotta, 72 NY2d 363, 369, 372 [1988]), rather than foreclose it by procedural barriers. (Saratoga County Chamber of Commerce v Pataki, 100 NY2d at 815.) Assuming these important considerations allow petitioners to maintain this proceeding, any expenditure of state funds caused by the directive’s implementation, in any event, is not wrongful because, as articulated below, the directive’s implementation itself is not wrongful, but entirely lawful. (Kennedy v Novello, 299 AD2d at 607; see Community Serv. Socy. v Cuomo, 167 AD2d at 170.)
III. Separation of Powers
A fundamental principle of government underlying the United States and New York Constitutions is the distribution of governmental power into three branches, executive, legislative, and judicial, “to prevent too strong a concentration” in one body. (Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344, 355 [1985]; see NY Const arts III [legislative power], IV [executive power], VI [judicial power]; Saratoga County Chamber of Commerce v Pataki, 100 NY2d at 821.) The separation of powers doctrine requires not that each branch of government be insulated from the others, but only that no one branch arrogate to itself the powers conferred exclusively on another branch. (Id. at 822; Bourquin v Cuomo, 85 NY2d 781, 784-785 [1995]; Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d at 356; Matter of Nicholas v Kahn, 47 NY2d 24, 30-31 [1979].)
As between the legislative and the executive branches, the separation of powers “requires that the Legislature make the critical policy decisions, while the executive branch’s responsibility is to implement those policies.” (Saratoga County Chamber of Commerce v Pataki, 100 NY2d at 821-822; Bourquin v Cuomo, 85 NY2d at 784.) This allocation of power and responsibility does not mean executive agencies never make policy. “The . . . *648 Legislature may declare its will, and after fixing a primary standard, endow administrative agencies with the power to fill in the interstices in the legislative product by prescribing rules and regulations consistent with the enabling legislation.” (Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib., 2 NY3d 249, 254 [2004]; Matter of Medical Socy. of State of N.Y. v Serio, 100 NY2d 854, 865 [2003]; Nicholas v Kahn, 47 NY2d at 31; see Raffellini v State Farm Mut. Auto. Ins. Co., 9 NY3d 196, 201 [2007]; Bourquin v Cuomo, 85 NY2d at 785.) A legislative enactment may rely on agency expertise, delegate broad authority to an agency to implement regulations prescribing the details and fulfilling the goals of the policy embodied in the statute, and vest the agency with reasonably wide discretion to make decisions consistent with those prescriptions. (Raffellini v State Farm Mut. Auto. Ins. Co., 9 NY3d at 201; General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib., 2 NY3d at 258; Matter of Big Apple Food Vendors’ Assn. v Street Vendor Review Panel, 90 NY2d 402, 407-408 [1997]; Bourquin v Cuomo, 85 NY2d at 785.) Only when an executive branch’s action conflicts with the Legislature’s action or usurps its prerogative does the executive branch violate the separation of powers doctrine.
The Governor’s directive is entirely consistent with this doctrine’s principles. In fact, it recognizes that the policy decisions have been made, implements them, and refrains from anything but “filling] in the interstices” in agency regulations and other policy statements to make them consistent with those decisions. (General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib., 2 NY3d at 254; Medical Socy. of State of N.Y. v Serio, 100 NY2d at 865; Nicholas v Kahn, 47 NY2d at 31; see Raffellini v State Farm Mut. Auto. Ins. Co., 9 NY3d at 201; General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib., 2 NY3d at 258; Big Apple Food Vendors’ Assn. v Street Vendor Review Panel, 90 NY2d at 407-408; Bourquin v Cuomo, 85 NY2d at 785.) Pursuant to the directive, where any state statute or controlling court decision construing a state statute already defines terms such as “spouse,” “husband,” and “wife,” a state agency may not interpret the statute, promulgate or interpret a regulation, or enforce a policy that defines such terms inconsistently with that binding definition.
A. Domestic Relations Law
Nonetheless, petitioners contend that the directive conflicts with the Domestic Relations Law’s definition of marriage, which *649 the New York Court of Appeals has interpreted as including only unions between one man and one woman. (Domestic Relations Law §§ 12, 15 [1] [a]; Hernandez v Robles, 7 NY3d at 357.) As held by one of the prior decisions against taxpayers on whether New York law bars recognition of same-sex marriages legally performed in other jurisdictions, the Court of Appeals in Hernandez dealt only with “intrastate licensing of same-sex marriage, not with interstate or foreign recognition of such marriages.” (Godfrey v Spano, 15 Misc 3d at 816; see Beth R. v Donna M., 19 Misc 3d 724, 727-728 [Sup Ct, NY County 2008].) The directive implements not the Domestic Relations Law, but New York’s marriage recognition rule, as interpreted and applied to same-sex marriages by the New York Appellate Division, in a decision binding on this court, Martinez v County of Monroe (50 AD3d at 192; see Tzolis v Wolff, 39 AD3d at 142; Nachbaur v American Tr. Ins. Co., 300 AD2d at 76). Hernandez v Robles (7 NY3d at 356-357), in holding that the New York Constitution does not mandate intrastate licensing of same-sex marriages, did not touch on whether New York recognizes those marriages if legally performed outside New York.
The State Legislature may have plenary power to regulate marriage within New York {id. at 356, 361, 366) and has exercised that power through the Domestic Relations Law, which, as interpreted by the Court of Appeals, currently limits marriage and all its protections, benefits, and privileges to unions between a man and a woman. {Id. at 357.) Recognizing same-sex marriages performed outside New York neither encroaches on that power nor conflicts with Hernandez’s holding that New York is not required to license same-sex marriages within the state.
As discussed more fully below, the Legislature also may have plenary power to regulate the recognition of marriages entered outside New York, but, conspicuously, has not exercised that power. Applying the default rule, the marriage recognition rule, unless and until the Legislature does alter the rule, does not in any way encroach on that power. (Martinez v County of Monroe, 50 AD3d at 193.) New Yorkers retain the opportunity, through their elected representatives, to decide whether New York will prohibit recognition of same-sex marriages or any other class of marriages (Hernandez v Robles, 7 NY3d at 366), or permit same-sex marriages to be entered in New York (id. at 356, 361, 366), either of which would resolve petitioners’ claim.
*650 B. Other Appellate Authority
Petitioners further contend that other Appellate Division decisions, equally binding on this court, dictate a result contrary to Martinez v County of Monroe (50 AD3d 189 [2008]). Each of those decisions, however, refused to recognize civil unions or life partnerships of same-sex couples for purposes of conferring New York statutory rights or benefits limited to spouses. (Matter of Langan v State Farm Fire & Cas., 48 AD3d 76, 78-79 [3d Dept 2007]; Langan v St. Vincent’s Hosp. of N.Y., 25 AD3d 90, 94-95 [2d Dept 2005]; Matter of Cooper, 187 AD2d 128, 131-132 [2d Dept 1993].) Both the courts and the other state legislatures, in providing for civil unions, took pains to distinguish a civil union or life partnership from marriage. Governor Paterson’s directive, by contrast, applies only to same-sex marriages and not to civil unions or life partnerships.
C. Comity
A determination of whether New York is to give effect to other jurisdictions’ governmental acts is based on whether they are consistent with New York’s public policy. If not, New York’s policy prevails. (Crair v Brookdale Hosp. Med. Ctr., Cornell Univ., 94 NY2d 524, 528 [2000]; Ehrlich-Bober & Co. v University of Houston, 49 NY2d 574, 580 [1980].)
New York’s public policy regarding valid marriages entered in New York is embodied in its Domestic Relations Law. New York’s public policy regarding which marriages entered in other jurisdictions will be recognized in New York is embodied in its marriage recognition rule. (Matter of Mott v Duncan Petroleum Trans., 51 NY2d 289, 292 [1980]; Cross v Cross, 102 AD2d 638, 640 [1st Dept 1984].) If under that rule same-sex marriages entered in other jurisdictions are to be recognized, then giving effect to those marriages does not conflict with New York’s public policy. (Crair v Brookdale Hosp. Med. Ctr., Cornell Univ., 94 NY2d at 531.)
As required by New York’s marriage recognition rule, a determination of whether a marriage entered in another jurisdiction is valid is based on that jurisdiction’s law. (Mott v Duncan Petroleum Trans., 51 NY2d at 292; Black v Moody, 276 AD2d 303, 304 [1st Dept 2000]; Lancaster v 46 NYL Partners, 228 AD2d 133, 141 [1st Dept 1996]; Cross v Cross, 102 AD2d at 639-640.) The rule applies even where the purpose of entering the marriage in another jurisdiction was to evade New York’s law proscribing those marriages. (Godfrey v Spano, 15 Misc 3d at 813, 816.) Martinez v County of Monroe (50 AD3d at 191) simply *651 follows this rule as set forth by the Court of Appeals and First Department. Thus, even if Martinez did not bind this court, the rule set forth by the Court of Appeals and First Department does, and the court’s application of the rule here leads to the same conclusion as in Martinez.
The marriage recognition rule’s exceptions, delineating which marriages entered outside New York will not be recognized, are narrow. The first exception pertains where the New York Legislature expressly has prohibited, by statute, recognizing a defined class of marriages validly entered outside New York. The second pertains where the marriage entered outside New York is abhorrent to public morality. (Mott v Duncan Petroleum Trans., 51 NY2d at 292; Martinez v County of Monroe, 50 AD3d at 191-192; Beth R. u Donna M., 19 Misc 3d at 728; Lewis v New York State Dept. of Civ. Serv., NYLJ, Mar. 18, 2008, at 28, col 2, 2008 NY Misc LEXIS 1623, *5.)
1. Legislative Prohibition
The Legislature has not exercised its power to prohibit recognition of same-sex marriages validly entered outside New York. Those marriages are not among the classes of marriages the Legislature has determined to be void or voidable (Domestic Relations Law §§ 5-7), or criminal offenses, which are limited to polygamous and closely incestuous marriages. (Penal Law §§ 255.15, 255.25.)
The Legislature’s refusal to enact a statute prohibiting recognition of same-sex marriages validly performed in other jurisdictions (Martinez v County of Monroe, 50 AD3d at 192-193; Godfrey v Hevesi, NYLJ, Sept. 18, 2007, at 28, col 3, 2007 NY Misc LEXIS 6589, *4-5; Godfrey v Spano, 15 Misc 3d at 814, 816) thus belies petitioners’ basic contention: that the Legislature has made a policy determination to limit recognition of marriages performed elsewhere to unions between a man and a woman. In fact, federal law expressly authorizes states to enact such legislation. (28 USC § 1738C.) Even so, New York has declined this opportunity.
This authorizing federal law, alongside the Domestic Relations Law and Penal Law provisions cited above, demonstrates compellingly that the Legislature’s failure to prohibit recognition of same-sex marriages, expressly and specifically, is not through legislative oversight, but is through legislative design: an intended exclusion. (McKinney’s Cons Laws of NY, Book 1, Statutes § 74; Pajak v Pajak, 56 NY2d 394, 397 [1982]; Bay Shore Family Partners v Foundation of Jewish Philanthropies of *652 Jewish Fedn. of Greater Fort Lauderdale, 239 AD2d 373, 374-375 [2d Dept 1997].) Any other construction of the Domestic Relations Law or legislative intent or policy would amount to “judicial legislation,” a result petitioners surely would eschew. (Pajak v Pajak, 56 NY2d at 397.)
A “fundamental canon of statutory construction” is that the court is not to review the Legislature’s discretion to refrain from exercising its power. (Id.; see Statutes § 73.) Nor is the court to step in and exercise its power where, in its view, the Legislature should have exercised what constitutionally was within the Legislature’s power. (Id.; Pajak v Pajak, 56 NY2d at 397.) A companion principle of statutory construction is that nothing short of an express and specific statutory provision may override the common law, expressed in the marriage recognition rule; abolish or limit its application; and preempt the rights under that common law that intervenors-respondents seek to vindicate in this action. (Hechter v New York Life Ins. Co., 46 NY2d 34, 39 [1978]; Tzolis v Wolff, 39 AD3d at 142,144; Rabouin v Metropolitan Life Ins. Co., 307 AD2d 843, 844 [1st Dept 2003].)
As set forth above, the New York Legislature has not spoken in the unambiguous, “unmuted strains necessary” to displace the common-law rule, the marriage recognition rule, and intervenors-respondents’ rights under it. (Hechter v New York Life Ins. Co., 46 NY2d at 39.) The court may not avoid its obligation to ensure compliance with the current, applicable rule, on the speculation that the Legislature intends otherwise. Therefore the court declines any invitation by petitioners to construe the Domestic Relations Law or the Legislature’s intent or policy as prohibiting New York’s recognition of same-sex marriages validly entered outside New York. (Pajak v Pajak, 56 NY2d at 397; Hechter v New York Life Ins. Co., 46 NY2d at 39.)
2. New York Public Policy
The very fabric of New York’s laws and other expressions of policy, reflecting community attitudes, negates the second exception’s applicability to same-sex marriages as abhorrent to public policy. (Beth R. v Donna M., 19 Misc 3d at 729-730; Godfrey v Spano, 15 Misc 3d at 816-817.) The Domestic Relations Law does not set the parameters of New York’s public policy regarding which marriages entered in other jurisdictions will be recognized in New York. New York’s marriage recognition rule would have no purpose or meaning if New York’s recognition of marriages entered in other jurisdictions conflicted with New York’s public policy when the Domestic Relations Law did not permit those marriages to be entered in New York.
*653 While the most fundamental and far-reaching protections and benefits to same-sex couples are through marriage, New York law does offer protections to same-sex couples: prohibitions against discrimination based on sexual orientation (Civil Rights Law § 40-c [2]; Executive Law § 296; Education Law § 313 [1] [a]; Insurance Law § 2701 [a]), increased criminal penalties for offenses involving animus based on sexual orientation (Penal Law § 240.30 [3]; §§ 240.31, 485.05 [1]), visitation rights in medical facilities (Public Health Law § 2805-q), the right to decide the disposition of a partner’s remains upon death (Public Health Law § 4201), access to a partner’s credit union services (Banking Law § 451), protection from eviction (NY City Rent and Eviction Regulations [9 NYCRR] § 2204.6 [d]; Braschi v Stahl Assoc. Co., 74 NY2d 201, 211-213 [1989]), and adoption of a partner’s biological child (18 NYCRR 421.16 [h] [2]; Matter of Jacob, 86 NY2d 651, 656, 668 [1995]), to list but a few. (See Godfrey v Spano, 15 Misc 3d at 817.) Surely the Legislature, the majorities of the Court of Appeals in Braschi and Jacob, and its Chief and Associate Judges, albeit in dissent, in Hernandez were not so out of the mainstream as to contradict New York’s public policy and morality. These expressions of New York’s public policy are only consistent with a tradition of affording equal rights to all New Yorkers, a tradition not to be abandoned lightly, without an unmistakable expression of legislative purpose.
Furthermore, when partners manifest the commitment to their relationship and family (see Braschi v Stahl Assoc. Co., 74 NY2d at 211, 213; East 10th St. Assoc. v Estate of Goldstein, 154 AD2d 142, 145 [1st Dept 1990]) by solemnizing that commitment elsewhere, through one of life’s most significant events, and come to New York, whether returning home or setting down roots, to carry on that commitment, nothing is more antithetical to family stability than requiring them to abandon that solemnized commitment. It is both a personal expression of emotional devotion, support, and interdependence and a public commitment. (Turner v Safley, 482 US 78, 95-96 [1987]; East 10th St. Assoc. v Estate of Goldstein, 154 AD2d at 143, 145.) With that validity, they expect equal treatment with other married couples in legal protections and economic benefits for the couples and for their children: owning property as a unit, insurance, workers’ compensation, health benefits, medical decision-making, wrongful death claims, intestacy, inheritance, and spousal privilege, for example. The emotional, familial, financial, *654 and legal stability that accompanies marriage establishes a strong presumption in favor of the marriage’s continued validity. (See Matter of Lowney, 152 AD2d 574, 576 [2d Dept 1989]; Matter of Seidel v Crown Indus., 132 AD2d 729, 730 [3d Dept 1987]; Amsellem, v Amsellem, 189 Misc 2d 27, 29 [Sup Ct, Nassau County 2001].)
For all these reasons, New York’s recognition of same-sex marriages legally solemnized in other jurisdictions is consistent with New York policy regarding recognition of marriages legally solemnized outside New York. (Martinez v County of Monroe, 50 AD3d at 192; Beth R. v Donna M., 19 Misc 3d at 729; Lewis v New York State Dept. of Civ. Serv., NYLJ, Mar. 18, 2008, at 28, col 4, 2008 NY Misc LEXIS 1623, *6-7.) The policy change that petitioners suggest is not the Governor’s directive. A policy change would be the failure to recognize same-sex marriages legally solemnized outside New York. Only the New York Legislature may legislate such a change. Absent such a change, the Governor’s directive is another permissible, if not mandated, step toward the objective of equality for a group for whom legal as well as practical barriers to equality persist.
D. Application of the Marriage Recognition Rule
Petitioners urge the court to ignore all these principles because the marriage recognition rule simply does not apply to same-sex marriages — because they are not marriages. Petitioners premise this contention on the assumption that, when the marriage recognition rule first evolved, same-sex marriages were not contemplated, even though same-sex couples may have been as known, perhaps not as publicly, as other unmarried couples.
Petitioners point to the Court of Appeals’ reliance on the premise that, when Domestic Relations Law §§ 12 and 15 (1) (a) first were enacted, same-sex marriages were not contemplated. (Hernandez v Robles, 7 NY3d at 357, 361.) Petitioners’ very rationale points up the distinction between the Domestic Relations Law and the marriage recognition rule: the Domestic Relations Law was enacted by the Legislature; the marriage recognition rule is a common-law rule that has evolved and continues to evolve through judicial decisions over time. In interpreting the Domestic Relations Law, the court looks to the legislative intent when the statute was enacted. In interpreting and applying the marriage recognition rule, the court looks to the rule’s current meaning and application in today’s world.
Accepting the premise that same-sex marriages were not contemplated when the marriage recognition rule first evolved *655 hardly leads to the conclusion that they are not contemplated now. The stark fact that they are legal in several jurisdictions completely undermines such a conclusion. Even if, historically, such a conclusion might have been viable, in the United States Supreme Court’s words, “times can blind us to certain truths and later generations can see that laws once thought. . . proper in fact serve only to oppress.” (Lawrence v Texas, 539 US 558, 579 [2003].) The marriage recognition rule’s virtue is that, like our Federal or State Constitution, as it endures, “persons in every generation can invoke its principles in their own search for greater freedom.” (Id.) The rule retains the adaptability to recognize that the definition of marriage has evolved from an institution of women’s subordination to men, to a more equal partnership, without gender based roles. (See Godfrey v Spano, 15 Misc 3d at 817.)
Other jurisdictions have cast off the constraints that exclusion from marriage licenses imposes on same-sex couples. Intervenors-respondents have freed themselves from those constraints imposed by New York’s Domestic Relations Law. Even in New York, nothing indicates a majority of New Yorkers disapprove of same-sex marriages. Such a proposition is refuted by the New York Assembly’s passage of a bill approving same-sex marriages and is currently untested in the full Legislature. (2007 NY Assembly Bill A8590.) Such disapproval, in any event, or even the prevalence of restrictions on same-sex marriages in most jurisdictions would not substitute for the grounds required to intrude on the common law, particularly a rule that applies “in an area of important personal decision.” (People v Onofre, 51 NY2d 476, 490 [1980]; see Lawrence v Texas, 539 US at 571, 577-578.)
While same-sex couples currently may be excluded from marriage licenses issued in New York, because “marriage” under the Domestic Relations Law as interpreted does not include same-sex couples, the marriage recognition rule does not define marriage by the classes of couples to whom it historically or traditionally has been accessible, either in New York or elsewhere. Nor would such a definition justify exclusion now of persons to whom marriage historically or traditionally has been inaccessible. (E.g. Matter of Raquel Marie X., 76 NY2d 387, 397 [1990]; Rivers v Katz, 67 NY2d 485, 493, 495 [1986].)
*656 IV Violation of Executive Law § 296 and the State Constitution’s Equal Protection Guarantee
Intervenors-respondents urge the court to hold, as in Martinez v County of Monroe (50 AD3d at 193), that, were the Governor to deny benefits to married couples of the same sex while conferring those benefits on other couples who entered a marriage that was permitted to be entered only outside New York, he would violate Executive Law § 296’s prohibition against discrimination on the basis of sexual orientation. Executive Law § 296 applies only to employment, education, public accommodations, housing, and commercial space; the executive directive encompasses these spheres as well as every other sphere the State regulates. The prohibited discrimination would be only in the spheres Executive Law § 296 encompasses, but they are far-reaching. To address the spheres beyond Executive Law § 296’s scope, intervenors-respondents urge the court to hold that, again, were the Governor to deny benefits to couples who entered a marriage that was permitted to be entered only outside New York, only if they are of the same sex, he would violate the New York Constitution’s prohibition against discrimination without a rational basis. (NY Const, art I, § 11.)
The difference between Martinez and this proceeding for purposes of addressing these issues is that in Martinez the Monroe County defendants did deny spousal benefits to a married couple of the same sex. In so doing, the county’s rejection of the plaintiffs marital status, because the plaintiff married a partner of the same sex, was based on the plaintiff’s sexual orientation. (Executive Law § 296 [1] [a]; Martinez v County of Monroe, 50 AD3d at 193.)
Fortunately for intervenors-respondents here, the Governor has taken contrary action and directed his agencies to confer spousal benefits on intervenors-respondents and all other couples similarly situated. Therefore he has done nothing to declare unlawful or to enjoin. Nor is he in a position to defend and provide a nondiseriminatory reason for intervenors-respondents’ or other persons’ different treatment, since it has not occurred. Nor are petitioners in a position to supply a rationale for an opposing party’s action, even had it occurred.
The obstacles to addressing the equal protection issue are similar, if not more obvious. For a challenge to different treatment to succeed on the ground that the classification has no rational basis and thus violates equal protection, intervenorsrespondents would have to show that the State’s classification *657 does not “rationally further a legitimate state interest.” (Affronti v Crosson, 95 NY2d 713, 718 [2001].) To survive such a challenge, the State would have to show both a legitimate state interest and that the classification rationally advances that interest. Because the Governor’s action is not challenged as discriminatory, no facts are presented to show either a classification or a legitimate state interest, other than treating similarly situated couples equally, or an irrational or a rational basis for treating them differently. Again, petitioners are not in a position to express New York State’s interests.
The executive directive’s text suggests that the potential liability for discrimination in violation of Executive Law § 296 and the State Constitution’s equal protection guarantee, had the Governor not taken the action he took, may have motivated the directive. The court need not speculate as to his motives or the legal consequences were he to take contrary action, because he has treated married couples of the same sex equally with married couples of different sexes and preserved the rights of intervenors-respondents and other couples similarly situated.
V Conclusion
Governor Paterson’s executive directive dated May 14, 2008, requiring state agencies to recognize same-sex marriages legally solemnized in other jurisdictions, is consistent with New York’s common law, statutory law, and constitutional separation of powers regarding recognition of marriages legally solemnized outside New York. (NY Const arts III, iy VI; CPLR 7803 [2], [3]; Martinez v County of Monroe, 50 AD3d at 193; Lewis v New York State Dept. of Civ. Serv., NYLJ, Mar. 18, 2008, at 28, col 4, 2008 NY Misc LEXIS 1623, *6-7; see CPLR 409 [b]; City of New York v State of New York, 94 NY2d 577, 588 and n 3 [2000]; Vinnie Montes Waste Sys. v Town of Oyster Bay, 150 Misc 2d 109, 114 [Sup Ct, Nassau County 1991].) The court therefore denies the declaratory and injunctive relief sought by the amended petition and grants respondents’ motions to dismiss this proceeding. (CPLR 7803 [2], [3]; 7806.) This decision constitutes the court’s order and judgment on the petition. (CPLR 409 [b]; 7806.)